IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  JUL - 8 2019  ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------

POWER UP LENDING GROUP, LTD.,

                  Plaintiff,

-against-

HEMP NATURALS, INC., LEVI JACOBSON,
AND YOSEF BLEIER,

                Defendants.

------------------------------------------------------------

**CV 19-3921**

Case Number

**NOTICE OF REMOVAL OF
ACTION UNDER 28 U.S.C.
§1441(a) and (b) FEDERAL
QUESTION AND DIVERSITY
BY DEFENDANTS HEMP
NATURALS, JACOBSON
AND BLEIER**

ROSS, J.

POLLAK, M.J.

      **PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. §§1331, 1332, 1441, and

1446, Defendants Hemp Naturals, Inc. ("Naturals"), Levi Jacobson ("Jacobson"), and Yosef

Bleier ("Bleier") hereby remove this civil action from the Supreme Court of the State of New

York, Nassau County, where it is currently pending as Case Number 607759/2019, to the United

States District Court for the Eastern District of New York.  Plaintiff's counsel has consented to

this removal, on the condition that venue rests in the Eastern District's courthouse in Central

Islip.

      "[A]ny civil action brought in a State court of which the district courts of the United

States have original jurisdiction, may be removed by the defendant or the defendants, to the

district court of the United States for the district and division embracing the place where such

action is pending." 28 U.S.C. §1441(a).  This court has original jurisdiction over this action

under both 28 U.S.C. §§1331 and 1332(a) on the grounds that there is a substantial federal

question underlying each of the Plaintiff's causes of action and that complete diversity exists

between all parties and the amount in controversy exceeds the sum of $75,000.00, exclusive of

interest and costs.

Plaintiff Power Up Lending Group, Ltd. ("Plaintiff" or "Power Up") is a corporation, incorporated in the Commonwealth of Virginia with an office in Nassau County in New York State.[1] *See* Complaint, Paragraph 7, Page 2.  Naturals is a Delaware corporation with its principal place of business in the State of Florida, County of Dade.  *See* Complaint, Paragraph 8, Pages 2 and 3.  Jacobson and Bleier are citizens of, and are domiciled in, the State of Florida. Defendant Jacobson has resided in the State of Florida since 2014, is registered to vote in the State of Florida, receives all of his mail in Florida, has an automobile registered in the State of Florida, and has no other residences, other than the residence in which he resides in Florida. Defendant Bleier has resided in the State of Florida since 2014, is registered to vote in the State of Florida, lives with his wife and child in the State of Florida, receives all of his mail in Florida, his child attends preschool in the State of Florida, he has an automobile registered in the State of Florida, and has no other residences, other than the residence in which he resides in Florida.

## BACKGROUND

### The Complaint

On or about June 7, 2019, Plaintiff commenced an action in the New York State Supreme Court in Nassau County, entitled *Power Up Lending Group, Ltd. v. Hemp Naturals, Inc., Levi Jacobson, and Yosef Bleier*, as case number 607759/2019.  A copy of the Summons and Complaint is attached hereto as Exhibit A.

Defendants were jointly served with a copy of the summons and complaint by e-mail from Plaintiff's counsel to the undersigned on June 19, 2019.  A copy of the e-mail by which the undersigned was served is attached hereto as Exhibit B.  The undersigned notified Plaintiff's

---

[1] The complaint fails to state where Plaintiff's principal place of business is located, but it makes no mention of any connections, of any nature, to the State of Florida.  The complaint does allege that Plaintiff is a citizen of the Commonwealth of Virginia.  *See* Complaint, Paragraph 7, Page 2.

counsel that he was willing to accept service on behalf of each defendant and hereby acknowledges sufficient and lawful service on June 19, 2019. A copy of the June 26, 2019 stipulation of service between Plaintiff's counsel and the undersigned is attached hereto as Exhibit C.

Plaintiff presents nine causes of action based upon Plaintiff's alleged loans to Naturals and related securities acquisition agreements. Each of Plaintiff's causes of action sound in securities fraud under the Exchange Act of 1933 (the "33 Act") and the Securities Exchange Act of 1934 (the "34 Act"). Pursuant to promissory notes dated December 6, 2018 ("December Note") and March 14, 2019 ("March Note") and Stock Purchase Agreements of the same dates (the "December SPA" and the "March SPA"), Plaintiff claims to have lent Naturals $43,000.00 in December of 2018 and $68,000.00 in March of 2019. The December Note is attached hereto as Exhibit D, the March Note is attached hereto as Exhibit E, the December SPA is attached hereto as Exhibit F, and the March SPA is attached hereto as Exhibit G. The December and March Notes are similar in all material respects, with the exception of the dates and the transaction amounts. The December and March SPAs are similar in all material respects, with the exception of the dates and the transaction amounts. The December and March Notes were both so-called "convertible notes," in that they contain provisions permitting Plaintiff to convert outstanding loan principal and unpaid interest into Naturals' common stock. Plaintiff also alleges that, upon Naturals' default, it was also afforded the right to the issuance of common stock.

## GROUNDS FOR REMOVAL

As set forth more fully below, this Court has original jurisdiction under 18 U.S.C.

§§1331 and 1332.  The Court therefore has removal jurisdiction pursuant to 28 U.S.C. §§1441

and 1446.

**I.     Complete Diversity Exists Between All Defendants and the Claims for Relief Exceed $75,000.00**

"The district courts shall have original jurisdiction of all civil actions where the

matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs,

and is between (1) citizens of different states." 28 U.S.C. §1332(a)(1).  Here, complete diversity

exists between the Plaintiff and all three Defendants.  "[A] corporation shall be deemed to be a

citizen of every State and foreign state by which it has been incorporated and of the State or

foreign state where it has its principal place of business."  28 U.S.C. §1332(c)(1); *see also R. G.*

*Barry Corp. v. Mushroom Makers, Inc.*, 612 F.2d 651, 654 (2d Cir. 1979).

"The amount in controversy is determined at the time the action is commenced."

*Chase Manhattan Bank, N.A. v. American National Bank & Trust Company*, 93 F.3d 1064, 1070

(2d Cir. 1996), *quoting Tongkook America, Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d

Cir. 1994).  "[T]he sum claimed by the plaintiff controls if the claim is apparently made in *good*

*faith*.  It must appear to a legal certainty that the claim is really for less than the jurisdictional

amount to justify dismissal."  *Id.*, *quoting St. Paul Mercury Indemnity Company v. Red Cab*

*Company*, 303 U.S. 283, 288-89 (1938).

As described above, Plaintiff is incorporated in the Commonwealth of Virginia and

has an office in Nassau County, New York.  While the complaint fails to allege where Plaintiff

has its principal place of business, it makes no mention of any connections that Plaintiff has, of

any nature, to the State of Florida.  According to the complaint, Plaintiff is a citizen of the

Commonwealth of Virginia.  If Plaintiff's principal place of business is an issue, Defendants

respectfully request the opportunity to conduct limited discovery regarding Plaintiff's business

operations limited solely to the question of subject matter jurisdiction.

Naturals is incorporated under the laws of the State of Delaware.  It's undisputed

principal place of business is the State of Florida.  Jacobson and Bleier are both domiciled in the

State of Florida, and are therefore Florida citizens for the purpose of 28 U.S.C. §§1441 and 1332.

Jacobson and Bleier have both resided in the State of Florida since 2014.  They both receive all

of their mail in Florida and have no other residence, other than the state of Florida.  Jacobson and

Defendant Bleier are both registered to vote in Florida and own automobiles that are registered

and garaged in the state of Florida.  Bleier's wife and daughter live with him in Florida and his

daughter attends a preschool in near the family home in Florida.

Plaintiff's first cause of action seeks $116,500.00 in damages.  Plaintiff's second

cause of action seeks $111,000.00 in damages.  Plaintiff's third cause of action seeks damages in

an unknown amount, but in no event less than $166,500.00.  Plaintiff's fourth cause of action

seeks damages in an unknown amount, but in no event less than $166,500.00.  Plaintiff's seventh

cause of action seeks damages in the amount of $166,500.00.  Plaintiff's eighth cause of action

seeks damages in the amount of $166,500.00.  Plaintiff's ninth cause of action seeks damages in

the amount of $166,500.00.

## II.    The Complaint is Based Upon Causes Arising Under the Federal Securities Laws

"The district courts shall have original jurisdiction of all civil actions arising under

the Constitution, laws, or treaties of the United States."  28 U.S.C. §1331.

Federal question jurisdiction lies both for plaintiffs pleading causes of action created

by federal law and for plaintiffs who bring state claims where it "appear[s] from the complaint

that the right to relief depends upon the construction or application of federal law." *Grable &*

*Sons Metal Products v. Darue Engineering & Manufacturing*, 545 U.S. 308, 312 (2005); *see also*

*Hodges v. Demchuk*, 866 F.Supp. 730, 733 (SDNY 1994) (federal question jurisdiction exists

where state law claims require the construction of substantial issues of federal law), *citing*

*Travelers Indemnity Company v. Sarkisian*, 794 F.2d 754, 762 (2d Cir. 1986); *see also In re*

*Facebook, Inc.*, 922 F.Supp.2d 475, 481 (SDNY 2013).  Here, the complaint presents several

causes of action that provide for recovery under the 33 Act and the 34 Act, as well as state claims

that require construction of the 33 Act, the 34 Act, and the SEC regulations promulgated

thereunder.

"[A] plaintiff may not defeat removal by omitting to plead necessary federal

questions." *Citadel Securities, LLC. v. Chicago Board of Options Exchange, Inc.*, 808 F.3d 694,

701 (7th Cir. 2015), *quoting Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 475 (1998)

(federal question exists under section 78aa of Title 15 (the 34 Act) for a suit challenging fees

charged by the defendant); *see also Flynn v. McDaniel*, 689 F.Supp.2d 686, 690 (SDNY 2010),

*citing Marcus v. ATT Corp.*, 138 F.3d 46, 55 (2d Cir. 1998) (plaintiff cannot avoid removal by

pleading a federal claim in state law terms); *see also In re Facebook, Inc., supra.*, 922 F.Supp.2d

at 480; *see also Town of Southold v. Go Green Sanitation, Inc.*, 949 F.Supp.2d 365, 373 (EDNY

2013).  "[T]he critical question for the court is whether the state law 'cause of action poses a

substantial federal question' by, for example, requiring interpretation of federal law." *Flynn,*

*supra., quoting D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 99 (2d Cir. 2001).

In its first cause of action, Plaintiff alleges that the December Note "provided that the

failure of [Defendant Naturals] to comply with the reporting requirements of [either the 33 Act

or the 34 Act] would also be a material event of default."  Complaint, Paragraph 16, Page 4.  The

Complaint further alleges that Naturals "willfully and unlawfully refused to take such steps as are necessary to comply with the reporting requirements of the Exchange Act and thus is default under both the Notes and the Agreements, . . . ." *See* Complaint, Paragraph 18, Pages 4 and 5. While the Complaint does not define "the Exchange Act," it is clear from the substance of the December and March Notes that the term Exchange Act, as used in the complaint, refers to either the 33 Act or the 34 Act, both of which are referenced in the first two pages of the December and March Notes. In addition, the December and March Notes also refer to the regulations promulgated under the Securities Exchange Act. The December and March Notes also provide that the common shares issuable upon conversion may not be sold or transferred unless such shares are sold pursuant to an effective registration statement under either the 33 Act or the 34 Act or that they are exempt from such registration requirement pursuant to Rule 144 (presumably promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act).[2] *See* December and March Notes, Paragraph 1.5. Furthermore, both the December and March Notes provide that Naturals' failure to comply with the reporting requirements of the Securities Exchange Act is a condition of default. *See* December and March Notes, Paragraph 3.8. Finally, the December and March Notes also make the restatement of any financial statements by Naturals with the Securities and Exchange Commission a condition of default. *See* December and March Notes, Paragraph 3.11. The December and March Notes similarly require that each transferee of the December and March Notes must be an "accredited investor," as that term is defined in Rule 501(a) of the Securities and Exchange Commission.

---

[2] The December and March Notes are drafted in such a way that they confuse the Exchange Act and the Securities Exchange Act. The December and March Notes define the Securities Exchange Act as "the Exchange Act," then intermittently refer to "the Act." It is unclear, based upon the careful defining of the Securities Exchange Act as "the Exchange Act," and the subsequent referencing of "the Act," to which Act the December and March Notes refer. Regardless, either the Exchange Act or the Securities Exchange Act raise questions of federal law.

Plaintiff's second cause of action is based upon a claim of fraud relying on the alleged fraudulent misrepresentations that Naturals would abide by the reporting requirements of either the 33 Act or the 34 Act and, in turn, alleges securities fraud by inducing Plaintiff to loan money to Naturals. *See* Complaint, Paragraph 24, Page 6. The complaint alleges that this "misrepresentation was the *most crucial* and important of all because it was always the bargained for expectation of Plaintiff . . . ." *Id.*

The complaint's third cause of action alleges a breach of contract, the breach of which allegedly consists of Naturals' failure to comply with the terms of either the 33 Act or the 34 Act. *See* Complaint, Paragraph 29, Page 6.

Plaintiff's fifth cause of action cites to the SEC Registration Statement and the SEC Form 15 allegedly filed by Naturals. *See* Complaint Paragraph 37, 43, 45, and 46, Pages 8, 9, 11, and 12. Paragraph 45 of the complaint specifically alleges that under either the 33 Act or the 34 Act, "the filing of the [SEC] Form 15 suspended the obligations of [Defendant Hemp] to file the required periodic reports with the SEC including Forms 10K, 10Q, and 8K all of which were necessary and material elements and conditions under the Notes and Agreements . . . ." Paragraph 46 of the complaint then asserts "[t]hat the filing of the [SEC] Form 15 was a blatant and willful default of Sections 3.7 and 3.8 of the [December Note and March Note] and Section 4(g) of the [December and March SPAs], . . . ." The allegations contained in Paragraphs 45 and 46 of the complaint cannot be properly litigated without substantial reliance on and reference to the 33 Act and 34 Act and the regulations promulgated thereunder.

Plaintiff's sixth cause of action cites Naturals' alleged failure to comply with the reporting requirements of either the 33 Act or the 34 Act or the failure to be subject to the reporting requirements of those acts as grounds for default. *See* Complaint, Paragraph 52, Page

13.  The same cause of action portrays Naturals' filing of a SEC Form 15 as an effort to frustrate Plaintiff's rights under the December and March Notes and requests an Order of this Court directing the withdrawal of the Form 15.  *See* Complaint, Paragraphs 56 and 57, Page 15.  This cause of action directly rests on the 33 Act, the 34 Act, the regulations thereunder, and the legal effect of Defendant Hemp's filing of an SEC Form 15.  These allegations all directly implicate federal law.

Plaintiff's seventh cause of action alleges that Jacobson's and Bleier's filing of the Form 15 evidenced their preconceived fraudulent intent to induce the Plaintiff to invest in Naturals.  *See* Complaint, Paragraphs 60, 63, and 64, Page 16.  The allegations contained in this cause of action rely directly on the effect of the Defendants' filing of the SEC Form 15 on Naturals' obligations under both the December Note and the March Note.  One cannot adjudicate the effect of the Defendants' filing of a Form 15 without reference to the 33 Act, the 34 Act, and the SEC regulations promulgated pursuant to those acts.

Plaintiff's eighth cause of action alleges that Naturals was insolvent before its SEC filings and that, as a result, Defendant Jacobson owed Naturals a fiduciary duty.  *See* Complaint, Paragraphs 68 and 69, Page 17.  As the Plaintiff's alleged evidence of Naturals' insolvency rests solely upon filings that Naturals allegedly made with the SEC, a federal question is raised regarding the effect of the alleged SEC filings and the effect of the SEC filings on the creation of the fiduciary duty that Plaintiff alleges existed at time material to the complaint's eight cause of action.

Finally, Plaintiff's ninth cause of action cites the SEC Form 15 filing as an act evidencing Jacobson's and Bleier's intentional interference with the contracts between Plaintiff and Naturals.  *See* Complaint, Paragraph 78, Page 18.  Plaintiff's allegations that Jacobson and

Bleier interfered with Plaintiff's contracts with Naturals cannot be litigated without adjudicating issues involving the alleged filing of the SEC Form 15 and its operative effect under the 33 Act, the 34 Act, and the SEC regulations promulgated under both of those acts.

### Prerequisites for Removal Have Been Met

This Notice of Removal is timely. 28 U.S.C. §1446(b)(2)(B) provides that each defendant has 30 days from receipt of the initial pleading to request removal. Defendants herein were served by e-mail upon the undersigned on June 19, 2019.

This action is properly removed to the United States District Court for the Eastern District of New York, Central Islip Division, which is the "district and division embracing the place where [the] action is pending." 28 U.S.C. §1441(a).

28 U.S.C. §1441(a) requires that the removing defendants provide a copy of "all process, pleadings, and orders served upon such defendant or defendants in such action." Copies of the summons and complaint are attached hereto as Exhibit A.

Notice to Adverse Party of Removal to Federal Court is attached as Exhibit H hereto. This notice and the Notice of Removal, with be served upon counsel for Plaintiff and the clerk of the New York State Supreme Court, Nassau County.

By filing this Notice of Removal, Defendants do not waive their right to object to jurisdiction over the person, or venue, and specifically reserve the right to assert any defenses and/or objections to which they may be qualified to assert.

If any question arises as to the propriety of removal of this action, Defendants respectfully request the opportunity to submit briefing and oral argument and to conduct discovery in support of their position that removal is proper and that subject matter exists.

**Conclusion**

Here, complete diversity exists between Plaintiff and each Defendant.  The threshold

amount for diversity actions, $75,000.00 is clearly exceeded.  Finally, each of Plaintiff's causes

of action raises a federal question under United States statutes and regulations promulgated

thereunder.  The prerequisites for removal have been satisfied.

Dated: New York, New York
       July 8, 2019

                                    **The Law Offices of Scott L. Fenstermaker, P.C.**


                         By:  _____
                                    Scott L. Fenstermaker, Esq.
                                    Signed Pursuant to Rule 11 of the Fed.R.Civ.Proc.
                                    Attorney for Defendants
                                    100 Park Avenue, 16th Floor
                                    New York, New York 10017
                                    917-817-9001
                                    scott@fenstermakerlaw.com


To:    Clerk of the Court
       United States District Court
       Eastern District of New York
       225 Cadman Plaza East
       Brooklyn, New York 11201

       Naidich Wurman, LLP
       Attorneys for Plaintiff
       111 Great Neck Road, Suite 214
       Great Neck, New York 11021

Case 2:19-cv-03921-ARR-CLP   Document 1   Filed 07/08/19   Page 12 of 92 PageID #: 12

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------------------X

POWER UP LENDING GROUP, LTD.,

                Plaintiff,

    -against-

HEMP NATURALS, INC., LEVI JACOBSON,
AND YOSEF BLEIER,

                Defendants.

-------------------------------------------------------------------X

Index No.
Plaintiff designates
Nassau County as the
place of trial

The basis of the venue
is by contract CPLR §501

**SUMMONS**
Plaintiff's principal place of
Business:
111 Great Neck Road –
    Ste. 216
Great Neck, NY 11021

    YOU ARE HEREBY SUMMONED to answer the Complaint in the above-entitled action and to serve a copy of your Answer on the Plaintiff's attorney within twenty (20) days after the service of this summons, exclusive of the day of service or within thirty (30) days after completion of service where service is made in any other manner than by personal delivery within the State. In case of your failure to appear or to answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated:  Great Neck, New York
        June7, 2019

                    NAIDICH WURMAN, LLP
                    Attorneys for Plaintiff
                    111 Great Neck Road - Suite 214
                    Great Neck, New York 11021
                    (516) 498-2900

Defendants' Addresses:

Hemp Naturals, Inc.
16950 North Bay Road - Suite 1803
Sunny Isles Beach, FL  33160

Levi Jacobson
16950 North Bay Road - Suite 1803
Sunny Isles Beach, FL  33160

Yosef Bleier
16950 North Bay Road - Suite 1803
Sunny Isles Beach, FL  33160

Case 2:19-cv-03921-ARR-CLP   Document 1   Filed 07/08/19   Page 14 of 92 PageID #: 14

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
---------------------------------------------------------------x
POWER UP LENDING GROUP, LTD.                          Index No.

                              Plaintiff
            -against-

HEMP NATURALS, INC., LEVI JACOBSON,
AND YOSEF BLEIER,

                              Defendants.
--------------------------------------------------------------- x

## COMPLAINT

Plaintiff, Power Up Lending Group, Ltd. ("Plaintiff"), files this Complaint and alleges the following:

## I. SUMMARY

1.      Plaintiff brings this action for equitable relief and damages caused by breaches of contract and tortious misconduct by Hemp Naturals, Inc. ("the Defendant" or "the Company"), Levi Jacobson and Yosef Bleier ("the Individual Defendants") (collectively, "the Defendants"). Through this action, Plaintiff seeks to recover losses caused by the Defendant's intentional and/or reckless misconduct, including compensatory damages, which losses may only be avoided if the relief described herein below is granted.

2.      That Plaintiff was an investor in the Defendant and was well-known to the Defendant. Plaintiff's business strategy at the time of the stock purchases and loans and issuance of notes at issue was to invest in publicly-traded, nano-cap companies whose securities are traded on the Over the Counter Bulletin Board, OTCQB and the "Pink Sheets." Nano-cap companies, such as the Defendant, are often capital-constrained, as their low market capitalization hinders their access to banks or investment firms. Plaintiff provides capital to such companies, as an investment in return for shares purchased at a discount to market price.

3.      That Plaintiff invested $111,000 in the Defendant by purchasing securities directly from the Defendant and making loans thereto, and has sustained damages in excess of $222,000, exclusive of attorney's fees, pre-judgment interest and costs.

## II.      JURISDICTION AND VENUE

4.      Defendant, directly and indirectly, singly or in concert, made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, or of the mails in connection with the acts, practices and courses of conduct alleged in this Complaint, certain of which occurred within the State of New York, County of Nassau.

5.      Venue is proper in this Court because Plaintiff transacts business and maintains its principal place of business in the State of New York, County of Nassau. In addition, the parties have agreed to jurisdiction and to place venue for this action in the State of New York, County of Nassau.

6.      That in connection with the acts alleged in this Complaint, the Defendant directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

7.      That at all times relevant herein, Plaintiff has been and remains a corporation organized and existing under the laws of the Commonwealth of Virginia with an office for business in the County of Nassau, State of New York, not engaged in the banking business, and is a citizen of the Commonwealth of Virginia.

8.      That at all times relevant herein, the Defendant has been and remains a corporation organized and existing under the laws of the State of Delaware, with an office for business in the

State of Florida, County of Miami Dade. That the Defendant has contractually agreed to consent to jurisdiction in the State of New York, County of Nassau and to place venue therein, and to apply Virginia law herein (Note, paragraph 4.7; Agreement, paragraph 8). That the Defendant is a citizen of the State of Delaware.

9.    That defendant Levi Jacobson ("Jacobson") has been and remains a resident of the State of Florida and the President and Chief Executive Officer of the Defendant, as well as the signatory on behalf of the Defendant to the Notes and Agreements that are the subject of this action, and as a result thereof, and his close relationship to the Defendant and the transactions themselves is bound by the jurisdiction and venue provisions contained in the Notes and Agreements. That Jacobson is a citizen of the State of Florida.

10.    That defendant Yosef Bleier ("Bleier") has been and remains a resident of the State of Florida, and a consultant to the Defendant with a direct financial interest in the Defendant and the transactions at issue here, such that by virtue of his close relationship to the Defendant and the transactions, as well as a conspiracy formed between himself, Jacobson and the Defendant is also bound by the jurisdiction and venue provisions contained in the Notes and Agreements. That Bleier is a citizen of the State of Florida.

### IV.    FACTUAL ALLEGATIONS

11.    That heretofore and from time to time, the Defendant, as well Jacobson and Bleier, acting in concert and in conspiracy against the Plaintiff, has made material misrepresentations of fact to Plaintiff, knowing that such misrepresentations were false, and upon which Plaintiff relied and was damaged.

12.    That as a result of these material misrepresentations, Plaintiff invested $111,000 in the Defendant and sustained damages thereby.

3

## AS AND FOR A FIRST CAUSE OF ACTION
## PROMISSORY NOTES DEFAULTS

13.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 12 of this Complaint with the same force and effect as if fully set forth at length herein.

14.    That on or about December 6, 2018, the Defendant, as borrower, made, executed and delivered to Plaintiff a convertible promissory note ("the December Note") in the amount of $43,000.00, which Note was issued pursuant to a Securities Purchase Agreement ("the December Agreement") of even date, which provided for certain issuance of, and conversion rights in and to the common stock of the Defendant.

15.    That the Agreements between the parties provided that venue for any action between the parties would be the State of New York, County of Nassau.

16.    That in the Note, the Defendant: (i) granted Plaintiff the right to convert all or any part of the outstanding and unpaid principal amount and accrued interest of the Note into fully paid and non-assessable shares of common stock of the Defendant; and (ii) agreed that an Event of Default of the Note shall occur upon the failure of the Defendant to timely issue shares of common stock of the Defendant to Plaintiff upon receipt of a conversion notice delivered pursuant to the Note. That in order to effectuate the conversion process, the Note also provided that the failure of the Defendant to comply with the reporting requirements of the Exchange Act would also be a material event of default.

17.    That on March 14, 2019, Defendant issued a Note and Securities Agreement to Plaintiff in identical form with the same terms and conditions as the December Note and Agreement in the amount of $68,000 ("the March Note and Agreement").

18.    That the Defendant has willfully and unlawfully refused to take such steps as are necessary to comply with the reporting requirements of the Exchange Act and thus is in default

4

under both the Notes and the Agreements, which defaults have never been cured and which have prevented conversions from taking place, thus totally frustrating and thwarting the purpose of the subject transaction by virtue of its actions, including, among other things, de-listing of it stock and rendering it untradeable.

19.     That by virtue of the foregoing, the Defendant is in default under the Notes and is also in default under the Agreements, and no such defaults have been cured.

20.     That the Defendant has not cured these defaults thereby causing damages to Plaintiff in an amount to be determined by the Court but not less than an amount equal to the existing and remaining principal balance under the Notes, which is calculated as $111,000 together with an additional amount of $111,000 as a result of the defaults, for a total due of $166,500 as of June 6, 2019. These additional damages arise from the fact that the Notes expressly provides that in the event of an uncured default, the obligor will be responsible for one and a half times (150%) of the amount of the principal balance then due as liquidated damages and not as a penalty.

21.     That the Defendant has caused damages to Plaintiff in an amount to be determined by the Court but not less than an amount equal to $166,500 together with applicable interest and default interest thereon from June 6, 2019, and the Plaintiff demands judgment accordingly. That no part of the amount due has been paid despite due demand.

## AS AND FOR A SECOND CAUSE OF ACTION - FRAUD

22.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 21 of this Complaint with the same force and effect as if fully set forth at length herein.

23.     That Plaintiff made an investment in the aggregate amount of One Hundred Eleven Thousand Dollars ($111,000.00) in the Defendant as a result of the foregoing transactions and as a result of the Defendant's defaults and intentional wrongdoing has not received any payment of

5

principal or interest on the Notes other than as stated above, and has also been deprived of its rights and opportunities to convert the debt into Conversion Shares as aforesaid.

24. That Plaintiff's willingness to assent to the terms of the investment and the Notes, and the investments themselves, was caused by the fraudulent misrepresentations of the Defendant contained within the Notes and Agreements and confirmed by resolutions of the Board of Directors and Officers Resolutions of the Defendant including but not limited to the representations that the Defendant would not fail to comply with the reporting requirements, which misrepresentation was the most crucial and important of all because it was always the bargained for expectation of Plaintiff and the intention of the parties that the repayment of the Note would occur via the conversion process.

25. That upon information and belief, the Defendant made the foregoing misrepresentations with the knowledge that Plaintiff would rely thereon, and that the Defendant had no intention to honor its obligations under the Note and the Agreement.

26. That as a result of the foregoing, Plaintiff has been irreparably harmed.

27. That the Defendant's actions have caused damages to Plaintiff in an amount to be determined by the Court but not less than an amount equal to $111,000.00 together with applicable interest thereon, and Plaintiff demands judgment accordingly.

AS AND FOR A THIRD CAUSE OF ACTION
<u>BREACH OF CONTRACT – LOST PROFITS</u>

28. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 27 of this Complaint with the same force and effect as if fully set forth at length herein.

29. That as a direct result of the defaults of the Defendant and its failure to abide by its contractual obligations, Plaintiff has been deprived of, and continues to be deprived of, the opportunity to acquire and to sell the common stock of the Defendant at a profit, which profits have been irretrievably lost as the markets for the common stock can no longer be recreated.

6

30.     That by reason of the foregoing, Plaintiff is entitled to judgment in an amount to be determined by the Court and equal to the lost profits that Plaintiff would have realized had the stock been made available and delivered to Plaintiff in accordance with its Conversion Notice.

AS AND FOR A FOURTH CAUSE OF ACTION
BREACH OF CONTRACT – LITIGATION EXPENSES

31.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 30 of this Complaint with the same force and effect as if fully set forth at length herein.

32.     That the Notes and Agreements provide that in the event of a dispute and/or litigation between the parties, the prevailing parties shall be entitled to recover all of its litigation expenses including reasonable attorney fees.

33.     That by reason of the foregoing, Plaintiff is entitled to a judgment against Defendant for the reasonable legal fees and litigation expenses paid or incurred in this action.

AS AND FOR A FIFTH CAUSE OF ACTION – BREACH OF CONTRACT

34.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 33 of this Complaint with the same force and effect as if fully set forth at length herein.

35.     That in the Notes, Defendant granted Plaintiff the right to convert all or any part of the outstanding and unpaid principal amount of the Note into fully paid and non-assessable shares of common stock of the Defendant, as described above.

36.     That Section 1.1 of the Note provides, in part, the following: "Conversion Right. The Holder shall have the right from time to time, and at any time on or prior to the later of: (i) the Maturity Date; and (ii) the date of payment of the Default Amount (as defined in Article III) pursuant to Section 1.6(a) or Article III, each in respect of the remaining outstanding principal amount of this Note to convert all or any part of the outstanding and unpaid principal amount of this Note into fully paid and non- assessable shares of Common Stock…"

7

37.    That Section 1.4(d) of the Note provides, in part, the following: "Delivery of Common Stock Upon Conversion. Upon receipt by the Borrower from the Holder of a facsimile transmission (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.4, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Common Stock issuable upon such conversion within three (3) business days after such receipt (and, solely in the case of conversion of the entire unpaid principal amount hereof, surrender of this Note) (such second business day being hereinafter referred to as the "Deadline") in accordance with the terms hereof and the Purchase Agreement (including, without limitation, in accordance with the requirements of [Section 2(g)] of the Purchase Agreement that certificates for shares of Common Stock issued on or after the effective date of the Registration Statement upon conversion of this Note shall not bear any restrictive legend). . . "

38.    That Section 1.4(e) of the Note provides, in part, the following: "Obligation of Borrower to Deliver Common Stock. . . . If the Holder shall have given a Notice of Conversion as provided herein, the Borrower's obligation to issue and deliver the certificates for Common Stock shall be absolute and unconditional, irrespective of the absence of any action by the Holder to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against any person or any action to enforce the same, any failure or delay in the enforcement of any other obligation of the Borrower to the holder of record, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder of any obligation to the Borrower, and irrespective of any other circumstance which might otherwise limit such obligation of the Borrower to the Holder in connection with such conversion."

39.    That Section 1.4(g) of the Note provides, in part, the following: "Failure to Deliver Common Stock Prior to Deadline. Without in any way limiting the Holder's right to pursue other

remedies, including actual damages and/or equitable relief, the parties agree that if delivery of the Common Stock issuable upon conversion of this Note is more than three (3) business days after the Deadline (other than a failure due to the circumstances described in Section 1.3 above, which failure shall be governed by such Section) the Borrower shall pay to the Holder $2,000 per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such Common Stock. Such cash amount shall be paid to Holder by the fifth day of the month following the month in which it has accrued or, at the option of the Holder (by written notice to the Borrower by the first day of the month following the month in which it has accrued), shall be added to the principal amount of this Note, in which event interest shall accrue thereon in accordance with the terms of this Note and such additional principal amount shall be convertible into Common Stock in accordance with the terms of this Note."

40.     That Section 3.2 of the Note provides, in part, the following as an "Event of Default" pursuant to the Notes: "Conversion and the Shares. The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any announcement, statement or threat not to honor its obligations shall not

be rescinded in writing) for three (3) days after the Borrower shall have been notified thereof in writing by the Holder."

41.    That Section 3.16 of the Note provides, the following: "Cross-Default. Notwithstanding anything to the contrary contained in this Note or the other related or companion documents, a breach or default by the Borrower of any covenant or other term or condition contained in any of the Other Agreements, after the passage of all applicable notice and cure or grace periods, shall, at the option of the Borrower, be considered a default under this Note and the Other Agreements, in which event the Holder shall be entitled (but in no event required) to apply all rights and remedies of the Holder under the terms of this Note and the Other Agreements by reason of a default under said Other Agreement or hereunder. "Other Agreements" means, collectively, all agreements and instruments between, among or by: (1) the Borrower, and, or for the benefit of, (2) the Holder and any affiliate of the Holder, including, without limitation, promissory notes; provided, however, the term "Other Agreements" shall not include the related or companion documents to this Note. Each of the loan transactions will be cross-defaulted with each other loan transaction and with all other existing and future debt of Borrower to the Holder."

42.    That Article III of the Note provides, in part, the following: "Upon the occurrence and during the continuation of any Event of Default specified in Section 3.1, 3.3, 3.4, 3.6, 3.8, 3.9, 3.11, 3.12, 3.13, 3.14 or 3.15 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), and upon the occurrence of an Event of Default specified the remaining sections of Articles III, the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts

10

Case 2:19-cv-03921-ARR-CLP Document 1 Filed 07/08/19 Page 24 of 92 PageID #: 24

referred to in clauses (w) and/or (x) plus (z) any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Sum") or (ii) the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum in accordance with Article I, treating the Trading Day immediately preceding the Mandatory Prepayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of a breach in respect of a specific Conversion Date in which case such Conversion Date shall be the Conversion Date), multiplied by (b) the highest Closing Price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Prepayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity. If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect."

43.    That compounding the felonious nature of the Defendant's conduct, on April 2, 2019, the Defendant filed a Form 15 with the United States Securities and Exchange Commission ("the SEC") which was again another material and highly prejudicial default under the Notes and

11

Agreements and undertaken for the principal purpose of again depriving the Plaintiff of its contractual rights in a fraudulent manner.

44.     That on April 3, 2019 Plaintiff served a formal Notice of Default on defendant, a copy of which is annexed hereto and incorporated herein; together with a copy of the Form 15.

45.     That under the Exchange Act, the filing of the Form 15 suspended the obligations of the Defendant to file the required periodic reports with the SEC including Forms 10K, 10Q, and 8K all of which were necessary and material elements and conditions under the Notes and Agreements because once the Defendant ceased such filings, its stock can no longer be traded or sold by the Plaintiff at the time of receipt, thereby completely thwarting all of the Plaintiff's contractual rights and rendering the transactions at issue valueless to the Plaintiff.

46.     That the filing of the Form 15 was a blatant and willful default of Sections 3.7 and 3.8 of the Note and Section 4 (g) of the Agreement, defaults which have never been cured or attempted to be cured.

47.     That the Defendant has not cured the defaults, thereby causing damages to the Plaintiff in an amount to be determined by the Court but not less than an amount equal to the sum of: (i) the greater of $111,000.00. and the "parity value" as such term is defined in the Note; and (ii) $2,000 per day until the issuance of the Conversion Shares; together with applicable interest at the default rates set forth in the Notes. That this amount is the amount of damages sustained by Plaintiff because under the Note and Agreement the Defendant is responsible for paying 150% of the principal value of the Note, which prior to default was $111,000.00.

48.     That by reason of the foregoing, Plaintiff demands judgment in an amount to be determined by the Court in an amount not less than $166,500.00 plus default interest from the date of default and $2,000 per day continuing until the issuance of the conversion shares.

<u>AS AND FOR A SIXTH CAUSE OF ACTION – SPECIFIC PERFORMANCE</u>

49.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1-48 of this Complaint with the same force and effect as if fully set forth at length herein.

50.     That as set forth in the definitive documents referred to herein, an essential element of the loan transactions between Plaintiff and Defendant are the conversion rights afforded to Plaintiff to obtain free trading discounted shares of the Defendant's stock.

51.     To ensure the issuance of the Defendant's shares pursuant to conversion notes issued by Plaintiff as part and parcel of the loan transactions, Plaintiff required the Defendant to agree that it would take no steps to frustrate the conversion rights of the Plaintiff.

52.     The Note provides that the following shall be material defaults under its terms and provisions:

> 3.7 Delisting of Common Stock.  The Borrower shall fail to maintain the listing of the Common Stock on at least one of the OTC, (which specifically includes the quotation platforms maintained by the OTC Markets Group) or an equivalent replacement exchange, the NASDAQ National Market, the NASDAQ S Cap Market, the New York Stock Exchange, or the NYSE American Stock Exchange.

> 3.8 Failure to Comply with the Exchange Act.  The Borrower shall fail to comply with the reporting requirements of the Exchange Act; and/or the Borrower shall cease to be subject to the reporting requirements of the Exchange Act.

53.     The purpose of these provisions is to ensure that the Plaintiff will be able to convert debt into stock of the Defendant and will then be able to sell that stock on the open market, as it is well known to both parties and the investment community in general that companies such as the Defendant are not expected to pay these obligations as they generally do not have the cash or other resources to do so and instead all parties expect and agree that payment shall be made by the conversion process, such that it is the acquisition of free trading stock that is the purpose of the

13

transaction and without which the transaction is valueless and would never be entered into by the Plaintiff.

54.     The conversion feature in loans made by Plaintiff to the Defendant were at all times an essential condition of the transactions such that without such rights to convert into free trading stock in accordance with the loan documents, Plaintiff would not have made any of these loans. Accordingly, both the notes and companion loan agreements provided in pertinent part as follows:

Note Paragraph 4.10:

4.10:  Remedies.     The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

Securities Purchase Agreement Section 8 (m):

8 (m):  Remedies.     The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach or threatened breach by the Company of the provisions of this Agreement, that the Buyer shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Agreement and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

55.     It is not possible to quantify the damages that would have sustained by Plaintiff based on Defendant's willful refusal to allow Plaintiff to exercise its conversion rights under the subject notes. At the time of each conversion, the discount available to Plaintiff permits it to obtain shares of the Defendant based on the average of the three lowest closing bid prices out of the last ten days that the Defendant's stock could be traded. Having obtained such shares on a periodic

basis, Plaintiff would then sell the shares so obtained in the open market thereby deriving a profit which could not be ascertained or quantified in advance.

56.     Defendant's willful and improper filing of the Form 15 as part and parcel of its refusal to permit the conversion process to go forward, and the overt attempts to frustrate, hinder and delay Plaintiff's conversion rights herein have and will result in irreparable harm for which there is no adequate remedy of law. By reason of the foregoing, at the time that the loan documents were executed, the Defendant acknowledged and consented to injunctive releases as set forth above.

57.     That by reason of the foregoing, Plaintiff seeks an Order of this Court for an affirmative injunction directing the Defendant, and all of the Defendant's agents, servants and employees, including its present and future transfer agents, to specifically perform the Defendant's obligations, to withdraw the Form 15, and to process all Notices of Conversion issued by the Plaintiff promptly and to issue the necessary shares requested in each conversion until the total obligations owed to the Plaintiff are paid in full including all default amounts due under the Notes. Additionally, Plaintiff requests that the Court issue an injunction prohibiting the Defendant from issuing any further shares of stock whether common or preferred, so as not to dilute Plaintiff's conversion process, until such time as the obligations owed by the Defendant to the Plaintiff under the Note have been fully satisfied.

58.     That the Plaintiff has no adequate remedy at law.

AS AND FOR A SEVENTH CAUSE OF ACTION – FRAUD IN THE INDUCEMENT

59.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 58 of this Complaint with the same force and effect as if fully set forth at length herein.

60.     That prior to entering into the transactions referred to above, the Defendant, Jacobson and Bleier failed to divulge that at the same time that they were entering into the Notes and

Agreements and accepting the proceeds of the Notes, that they had a preconceived intent to default under the same by filing the Form 15 promptly after executing the Notes and Agreements and accepting the proceeds.

61.     That the Defendants were under a duty to speak and to reveal those material facts, all of which should also have been revealed to the Plaintiff.

62.     That the Plaintiff entered into the transactions complained of and advanced the funds referred to above without any knowledge of such wrongdoing, and the Plaintiff would never have done so had it been aware of these allegations of wrongdoing as described above.

63.     In an obvious intent to defraud, the Plaintiff only a few days (12 days – 8 business days) after receiving the funding from the Plaintiff, the Defendants caused the Form 15 to be filed thereby causing the Company to breach and abrogate the Company's obligations under the Notes and Agreements. That had the Defendants not concealed the truth in deliberate fashion from the Plaintiff, the Plaintiff would never had advanced the funds at issue and would have sustained no damages whatsoever.

64.     That continuing thereafter and to the present day, the Defendants have failed and refused to withdraw the Form 15, thereby evidencing their malicious and purposeful intent to defraud the Plaintiff as part and parcel of a fraudulent conspiracy among all of the Defendants.

65.     That had the Plaintiff known of the truth of the Defendants' intentions, the Plaintiff never would have engaged in the transactions complained of or advanced the funds at issue, such that the Plaintiff was defrauded by the Company, Jacobson and Bleier acting in concert.

66.     That by reason of the foregoing, Plaintiff demands judgment for the sum of $116,500 plus interest.

## AS AND FOR AN EIGHTH CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY

67.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 66 of this Complaint with the same force and effect as if fully set forth at length herein.

68.    That at all times relevant herein, the Company was an insolvent corporation as its debts exceeded its assets and it was unable to pay its current expenses as they came due.

69.    That in the filings that the Company made with the SEC prior to its defaults, the Defendant admitted that it was an insolvent corporation both from a standpoint of net worth and the standpoint of income and expense.

70.    That at all times relevant herein, Jacobson was an officer and director of the Company and that as a result of the Company's insolvency, a fiduciary relationship came into being between the Plaintiff, as a creditor of the Company, and Jacobson.

71.    That Jacobson was therefore under a fiduciary obligation to use his best efforts and exercise his judgment and discretion to see to it that the assets of the Company would be utilized or made available for the benefit of the Plaintiff as a creditor of the Company.

72.    That Jacobson failed and refused to adhere to his fiduciary obligations or to honor the same and failed to use his best efforts and judgment to make such assets available to the Plaintiff, thereby causing the Plaintiff irreparable financial harm.

73.    That by reason of the foregoing, Plaintiff demands judgment against Jacobson for the sum of $116,500 based on the cause of action of breach of fiduciary duty.

## AS AND FOR A NINTH CAUSE OF ACTION – INTENTIONAL INTERFERENCE WITH CONTRACT

74.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 73 of this Complaint with the same force and effect as if fully set forth at length herein.

17

75.    That Jacobson and Bleier were fully aware at all times of the existence and the valid and binding nature of the Notes and Agreements and that the same were legally enforceable contractual obligations of the Company.

76.    That Jacobson and Bleier intentionally and with malice of forethought caused the Company to breach the Notes and Agreements without any legal or factual justification.

77.    That Jacobson and Bleier caused these breaches and defaults to take place for their own personal benefit as their actions made the funds advanced by Plaintiff available to be paid to themselves in compensation and other financial benefits, rather than to be used for legitimate corporate obligations or to be repaid to Power Up.

78.    That as further evidence of this conspiracy to intentionally interfere with the Plaintiff's contractual rights, Jacobson and Bleier deliberately caused the Company to file the Form 15 thereby making it impossible for the Plaintiff to convert the Notes into stock of the Company and totally frustrating the entire purpose of the transactions.

79.    That Jacobson and Bleier took these actions for their own personal benefit and not for the benefit of the Company.

80.    That as a result of Jacobson and Bleier are liable to Power Up under the theory of intentional interference of contract, thereby causing damages to Power Up of at least $166,500.

WHEREFORE, PLAINTIFF demands judgment against Defendants as follows:

(i)    For $116,500 on the First Cause of Action;

(ii)    For $111,000 on the Second Cause of Action;

(iii)    For an amount of lost profits to be determined by the Court but in no event less than $166,500 on the Third Cause of Action;

(iv)    Awarding Plaintiff its reasonable legal fees and costs of litigation on the Fourth Cause of Action;

FILED: NASSAU COUNTY CLERK 06/07/2019 02:34 PM

INDEX NO. 607739/2019

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 06/07/2019

(v)      For an award of consequential damages in an amount to be determined by the Court but no less than $166,500 on the Fifth Cause of Action;

(vi)     For a judgment awarding specific performance of the Defendant's contractual obligations under the Note and Agreement, and directing a mandatory injunction compelling the Defendant and its present and future transfer agent to withdraw the Form 15 filed with the SEC and to permit the conversion of the Note into common stock and the subsequent sale of such stock by Plaintiff in accordance therewith on the Sixth Cause of Action; and

(vii)    For $166,500 on the Seventh Cause of Action;

(viii)   For $166,500 on the Eighth Cause of Action;

(ix)     For $166,500 on the Ninth Cause of Action; and

(x)      Together with the costs and disbursements of this action; interest at the rate of default as set forth in the Note; pre-judgment interest as provided by statute, and such other and further relief as the Court may deem just and proper.

Dated: Great Neck, New York
June 7, 2019

NAIDICH WURMAN LLP

By: _____
       Richard S. Naidich, Esq. (RSN 4102)
       111 Great Neck Road, Suite 214
       Great Neck, NY 11021
       Telephone:    516-498-2900
       Facsimile:    516-466-3555
       Attorneys for Plaintiff

19

## VERIFICATION

STATE OF NEW YORK ) 
                 ) ss.:
COUNTY OF NASSAU )

CURT KRAMER being duly sworn, deposes and says: That I am the President of POWER UP LENDING GROUP, LTD. and that I have read the foregoing Verified Complaint and know the contents thereof; the same is true to the best of my knowledge, except as to those matters therein stated to be alleged upon information and belief and as to those matters, I believe them to be true.

_____
CURT KRAMER

Sworn to before me this
____ day of June, 2019

_____
NOTARY PUBLIC

ROBERT P. JOHNSON
NOTARY PUBLIC STATE OF NEW YORK
NO. 30-4735214
QUALIFIED IN NASSAU COUNTY
COMMISSION EXPIRES MARCH 30, 1

FILED: NASSAU COUNTY CLERK 06/07/2019 02:34 PM          INDEX NO. 607759/2019
NYSCEF DOC. NO. 1                                      RECEIVED NYSCEF: 06/07/2019

**CZARNIK & ASSOCIATES**
245 Park Avenue
39th Floor
New York, New York 10167

Stephen J. Czarnik, Esq.
tel. (212) 961-7950
fax.(212) 658-9915
sczarnik@czarnikco.com

April 3, 2019

VIA Email and Federal Express: hempofnaturals@gmail.com

HEMP NATURALS, INC.
16950 North Bay Road, Suite 1803
Sunny Isles Beach, Florida 33160
Attn: Levi Jacobson, Chief Executive Officer

    **RE:**    **Power Up Lending Group Ltd. – Convertible Promissory Notes**

Mr. Jacobson:

    As you are aware, I am special counsel to Power Up Lending Group Ltd. ("PowerUp"). Your firm, HEMP NATURALS, INC. (the "Company"), is the maker of two (2) Convertible Promissory Notes, dated, respectively, December 6, 2018 and March 14, 2019 (collectively, the "Notes") in favor of PowerUp wherein pursuant to the Notes, PowerUp loaned to the Company $111,000.00 in the aggregate. In connection with the transactions contemplated by the Notes, the Company also executed other documents including but not limited a Securities Purchase Agreement, Share Reverse Letter and Officers Certificate.

    Yesterday, on April 2, 2019, the Company filed a Form 15 with the Securities and Exchange Commission to terminate its reporting status. The filing of the Form 15 is a willful and purposeful act to hinder, frustrate and delay the conversion of the Notes.

    Section 3.8 of each of the Notes provides the following as an Event of Default:

"3.8    Failure to Comply with the Exchange Act. The Borrower shall fail to comply with the reporting requirements of the Exchange Act; and/or the Borrower shall cease to be subject to the reporting requirements of the Exchange Act."

*HEMP NATURALS, INC.*
*April 3, 2019*
*Page 2 of 3*

Each of the Notes further provide in Article III

". . .UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 3.2, THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGATIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT AMOUNT (AS DEFINED HEREIN); MULTIPLIED BY (Z) TWO (2). Upon the occurrence and during the continuation of any Event of Default specified in Sections 3.1 (solely with respect to failure to pay the principal hereof or interest thereon when due on this Note or upon acceleration), 3.3, 3.4, 3.7, 3.8, 3.10, 3.11, 3.12, 3.13, and/or 3.14 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), and upon the occurrence of an Event of Default specified the remaining sections of Articles III (other than failure to pay the principal hereof or interest thereon at the Maturity Date specified in Section 3.1 hereof), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) plus (z) any amounts owed to the Holder pursuant to Section 1.4(e) hereof (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity.

If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect. "

Based upon the foregoing, the Company is in default under the Notes.  Demand is hereby made for the immediate payment (as provided in the Note) of $222,000.00 together with accrued interest and accrued default interest with respect to each of the Notes. Your failure to comply with the demand of this letter will result in PowerUp exercising all of its rights and remedies available to it at law or in equity against the Company and its officers and directors individually including but not limited to an action for fraudulent inducement as the March note was consummated less than two (2) weeks ago.

*HEMP NATURALS, INC.*
*April 3, 2019*
*Page 3 of 3*

We look forward to your immediate response.

Regards,

cc:     Mr. Curt Kramer
        Chief Executive Officer
        Power Up Lending Group Ltd.

FILED: NASSAU COUNTY CLERK 06/07/2019 02:34 PM       INDEX NO. 607759/2019
NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 06/07/2019

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

## FORM 15

**CERTIFICATION AND NOTICE OF TERMINATION OF REGISTRATION UNDER SECTION 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934 OR SUSPENSION OF DUTY TO FILE REPORTS UNDER SECTIONS 13 AND 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

Commission File Number   **000-55590**

**Hemp Naturals, Inc.**

(Exact name of registrant as specified in its charter)

**16950 North Bay Road, Suite 1803**

**Sunny Isles Beach, Florida 33160**

**(347) 301-8431**

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Common Stock, par value $0.0001 per share**

(Title of each class of securities covered by this Form)

**None**

(Titles of all other classes of securities for which a duty to file reports under section 13(a) or 15(d) remains)

Please place an X in the box(es) to designate the appropriate rule provision(s) relied upon to terminate or suspend the duty to file reports:

| | |
|---|---|
| Rule 12g-4(a)(1) | ☒ |
| Rule 12g-4(a)(2) | ☐ |
| Rule 12h-3(b)(1)(i) | ☐ |
| Rule 12h-3(b)(1)(ii) | ☐ |
| Rule 15d-6 | ☐ |

Approximate number of holders of record as of the certification or notice date:   **57**

Pursuant to the requirements of the Securities Exchange Act of 1934 Hemp Naturals, Inc. has caused this certification/notice to be signed on its behalf by the undersigned duly authorized person.

Date: April 2, 2019                    By:   /s/ Levi Jacobson
                                       Levi Jacobson
                                       President, Chief Executive Officer, Secretary, Treasurer and
                                       Director

Sunday, July 7, 2019 at 4:28:22 PM Eastern Daylight Time

| | |
|---|---|
| **Subject:** | RE: Hemp Naturals |
| **Date:** | Wednesday, June 19, 2019 at 4:16:36 PM Eastern Daylight Time |
| **From:** | rjohnson@nwlaw.com |
| **To:** | 'Scott Fenstermaker' |
| **CC:** | 'Curt Kramer', 'Seth Kramer', dyork@nwlaw.com, 'Bernard Feldman', 'Stephen J. Czarnik', 'Jim Cozens' |
| **Attachments:** | Power Up v. Hemp Naturals, Inc. - Notice of Commencement of Action.pdf, Power Up v. Hemp Naturals, Inc., et al - Summons & Verified Complaint.pdf |

Scott:

Please see herewith a copy of the Summons, Complaint and Notice of Commencement of Action.. Please file your Notice of Appearance at your earliest possible opportunity. Since you are accepting service on behalf of the defendants, I will advise my process server to cease operations.

Bob Johnson


Robert P. Johnson, Esq.
Naidich Wurman LLP
111 Great Neck Road – Suite 214
Great Neck, NY 11021
Tel No.: (516) 498-2900
Fax No.: (516) 466-3555
Email: rjohnson@nwlaw.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.


**From:** Scott Fenstermaker <scott@fenstermakerlaw.com>
**Sent:** Wednesday, June 19, 2019 2:53 PM
**To:** rjohnson@nwlaw.com
**Subject:** Hemp Naturals

Bob,

I'm appearing for Hemp Naturals, Levi Jacobson, and Yosef Bleier in the matter that your client Power Up

recently filed against them in Nassau County.  Feel free to serve any papers in this case on me by emailing them to me and I will accept such service as valid service under the CPLR.

Scott

Scott L. Fenstermaker, Esq.
100 Park Avenue, 16th Floor
New York, New York 10017
(212) 302-0201 (Office)
(917) 817-9001 (Cellular)
scott@fenstermakerlaw.com
Sent from my iPhone

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
------------------------------------------------------------x

POWER UP LENDING GROUP, LTD.                              Index No.: 607759/2019

                                    Plaintiff

            -against-

                                                         STIPULATION ACCEPTING
                                                              SERVICE

HEMP NATURALS, INC., LEVI JACOBSON,
AND YOSEF BLEIER,

                                    Defendants.
------------------------------------------------------------x

        IT IS HEREBY STIPULATED AND AGREED, by and between the parties and their

respective attorneys as follows:

        1.      Scott L. Fenstermaker, Esq., hereby accepts service of the Summons, Complaint

and Notice of Electronic Filing on behalf of all defendants and acknowledges receipt of same on

June 19, 2019.

        2.      The defendants shall have until July 19, 2019 to answer or move against the complaint.

        3.      This stipulation may be executed by fax or e-mail and such signature shall be as

valid and binding as an original.

Dated: Great Neck, New York
       June 26, 2019


SCOTT L. FENSTERMAKER, ESQ.            NAIDICH WURMAN LLP
100 Park Avenue
New York, NY 10017                     By:
Telephone:  (212) 302-0201             RICHARD S. NAIDICH, ESQ.
Facsimile:  (212) 302-0327             111 Great Neck Road – Suite 214
Attorneys for Defendants               Great Neck, NY 11021
                                       Telephone: 516-498-2900
                                       Facsimile: 516-466-3555
                                       Attorneys for Plaintiff



NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

**Principal Amount: $43,000.00**　　　　　　　　**Issue Date: December 6, 2018**
**Purchase Price:  $43,000.00**

### CONVERTIBLE PROMISSORY NOTE

      **FOR VALUE RECEIVED, HEMP NATURALS, INC.,** a Delaware corporation (hereinafter called the "Borrower"), hereby promises to pay to the order of **POWER UP LENDING GROUP LTD.,** a Virginia corporation, or registered assigns (the "Holder") the sum of $43,000.00 together with any interest as set forth herein, on December 6, 2019 (the "Maturity Date"), and to pay interest on the unpaid principal balance hereof at the rate of twelve percent (12%)(the "Interest Rate") per annum from the date hereof (the "Issue Date") until the same becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise.  This Note may not be prepaid in whole or in part except as otherwise explicitly set forth herein. Any amount of principal or interest on this Note which is not paid when due shall bear interest at the rate of twenty two percent (22%) per annum from the due date thereof until the same is paid ("Default Interest"). Interest shall be computed on the basis of a 365 day year and the actual number of days elapsed. Interest shall commence accruing on the Issue Date but shall not be payable until the Note becomes payable (whether at Maturity Date or upon acceleration or by prepayment).  All payments due hereunder (to the extent not converted into common stock, $0.0001 par value per share (the "Common Stock") in accordance with the terms hereof) shall be made in lawful money of the United States of America. All payments shall be made at such address as the Holder shall hereafter give to the Borrower by written notice made in accordance with the provisions of this Note. Each capitalized term used herein, and not otherwise defined, shall have the meaning ascribed thereto in that certain Securities Purchase Agreement dated the date hereof, pursuant to which this Note was originally issued (the "Purchase Agreement").

      This Note is free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Borrower and will not impose personal liability upon the holder thereof.

      The following terms shall apply to this Note:

### ARTICLE I. CONVERSION RIGHTS

      1.1    <u>Conversion Right</u>.  The Holder shall have the right from time to time, and at any time during the period beginning on the date which is one hundred eighty (180) days following the date of this Note and ending on the later of: (i) the Maturity Date and (ii) the date of payment of the Default

Amount (as defined in Article III), each in respect of the remaining outstanding principal amount of this Note to convert all or any part of the outstanding and unpaid principal amount of this Note into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified at the conversion price (the "Conversion Price") determined as provided herein (a "Conversion"); provided, however, that in no event shall the Holder be entitled to convert any portion of this Note in excess of that portion of this Note upon conversion of which the sum of (1) the number of shares of Common Stock beneficially owned by the Holder and its affiliates (other than shares of Common Stock which may be deemed beneficially owned through the ownership of the unconverted portion of the Notes or the unexercised or unconverted portion of any other security of the Borrower subject to a limitation on conversion or exercise analogous to the limitations contained herein) and (2) the number of shares of Common Stock issuable upon the conversion of the portion of this Note with respect to which the determination of this proviso is being made, would result in beneficial ownership by the Holder and its affiliates of more than 4.99% of the outstanding shares of Common Stock.  For purposes of the proviso to the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Regulations 13D-G thereunder, except as otherwise provided in clause (1) of such proviso. The beneficial ownership limitations on conversion as set forth in the section may NOT be waived by the Holder. The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing the Conversion Amount (as defined below) by the applicable Conversion Price then in effect on the date specified in the notice of conversion, in the form attached hereto as Exhibit A (the "Notice of Conversion"), delivered to the Borrower by the Holder in accordance with Section 1.4 below; provided that the Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in, or reasonably expected to result in, notice) to the Borrower before 6:00 p.m., New York, New York time on such conversion date (the "Conversion Date"); however, if the Notice of Conversion is sent after 6:00pm, New York, New York time the Conversion Date shall be the next business day. The term "Conversion Amount" means, with respect to any conversion of this Note, the sum of (1) the principal amount of this Note to be converted in such conversion plus (2) at the Holder's option, accrued and unpaid interest, if any, on such principal amount at the interest rates provided in this Note to the Conversion Date, plus (3) at the Holder's option, Default Interest, if any, on the amounts referred to in the immediately preceding clauses (1) and/or (2) plus (4) at the Holder's option, any amounts owed to the Holder pursuant to Sections 1.4 hereof.

      1.2   Conversion Price.  The conversion price (the "Conversion Price") shall equal the Variable Conversion Price (as defined herein) (subject to equitable adjustments by the Borrower relating to the Borrower's securities or the securities of any subsidiary of the Borrower, combinations, recapitalization, reclassifications, extraordinary distributions and similar events).   The "Variable Conversion Price" shall mean 55% multiplied by the Market Price (as defined herein) (representing a discount rate of 45%).  "Market Price" means the lowest one (1) Trading Price (as defined below) for the Common Stock during the twenty (20) Trading Day period ending on the latest complete Trading Day prior to the Conversion Date.  "Trading Price" means, for any security as of any date, the closing bid price on the OTCQB, OTCQX, Pink Sheets electronic quotation system or applicable trading market (the "OTC") as reported by a reliable reporting service ("Reporting Service") designated by the Holder (i.e. Bloomberg) or, if the OTC is not the principal trading market for such security, the closing bid price of such security on the principal securities exchange or trading market where such security is listed or traded or, if no closing bid price of such security is available in any of the foregoing manners, the average of the closing bid prices of any market makers for such security that are listed in the "pink sheets".  If the Trading Price cannot be calculated for such security on such date in the manner provided above, the Trading Price shall be the fair market value as reasonably determined by the Borrower.  "Trading Day" shall mean any day on which the

2

Common Stock is tradable for any period on the OTC, or on the principal securities exchange or other securities market on which the Common Stock is then being traded.

1.3     Authorized Shares.   The Borrower covenants that during the period the conversion right exists, the Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Stock upon the full conversion of this Note issued pursuant to the Purchase Agreement.  The Borrower is required at all times to have authorized and reserved ten times the number of shares that would be issuable upon full conversion of the Note (assuming that the 4.99% limitation set forth in Section 1.1 is not in effect)(based on the respective Conversion Price of the Note (as defined in Section 1.2) in effect from time to time, initially 9,090,909)(the "Reserved Amount").  The Reserved Amount shall be increased (or decreased with the written consent of the Holder) from time to time in accordance with the Borrower's obligations hereunder.  The Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable.  In addition, if the Borrower shall issue any securities or make any change to its capital structure which would change the number of shares of Common Stock into which the Notes shall be convertible at the then current Conversion Price, the Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved, free from preemptive rights, for conversion of the outstanding Note.  The Borrower (i) acknowledges that it has irrevocably instructed its transfer agent to issue certificates for the Common Stock issuable upon conversion of this Note, and (ii) agrees that its issuance of this Note shall constitute full authority to its officers and agents who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Common Stock in accordance with the terms and conditions of this Note.

If, at any time the Borrower does not maintain the Reserved Amount it will be considered an Event of Default under Section 3.2 of the Note.

1.4     Method of Conversion.

(a)     Mechanics of Conversion.  As set forth in Section 1.1 hereof, from time to time, and at any time during the period beginning on the date which is one hundred eighty (180) days following the date of this Note and ending on the later of: (i) the Maturity Date and (ii) the date of payment of the Default Amount, this Note may be converted by the Holder in whole or in part at any time from time to time after the Issue Date, by (A) submitting to the Borrower a Notice of Conversion (by facsimile, e-mail or other reasonable means of communication dispatched on the Conversion Date prior to 6:00 p.m., New York, New York time) and (B) subject to Section 1.4(b), surrendering this Note at the principal office of the Borrower (upon payment in full of any amounts owed hereunder).

(b)     Surrender of Note Upon Conversion.  Notwithstanding anything to the contrary set forth herein, upon conversion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Borrower unless the entire unpaid principal amount of this Note is so converted.  The Holder and the Borrower shall maintain records showing the principal amount so converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Borrower, so as not to require physical surrender of this Note upon each such conversion.

(c)     Delivery of Common Stock Upon Conversion.  Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this

Section 1.4, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Common Stock issuable upon such conversion within two (2) business days after such receipt (the "Deadline") (and, solely in the case of conversion of the entire unpaid principal amount hereof, surrender of this Note) in accordance with the terms hereof and the Purchase Agreement. Upon receipt by the Borrower of a Notice of Conversion, the Holder shall be deemed to be the holder of record of the Common Stock issuable upon such conversion, the outstanding principal amount and the amount of accrued and unpaid interest on this Note shall be reduced to reflect such conversion, and, unless the Borrower defaults on its obligations hereunder, all rights with respect to the portion of this Note being so converted shall forthwith terminate except the right to receive the Common Stock or other securities, cash or other assets, as herein provided, on such conversion. If the Holder shall have given a Notice of Conversion as provided herein, the Borrower's obligation to issue and deliver the certificates for Common Stock shall be absolute and unconditional, irrespective of the absence of any action by the Holder to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against any person or any action to enforce the same, any failure or delay in the enforcement of any other obligation of the Borrower to the holder of record, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder of any obligation to the Borrower, and irrespective of any other circumstance which might otherwise limit such obligation of the Borrower to the Holder in connection with such conversion.

(d)     Delivery of Common Stock by Electronic Transfer. In lieu of delivering physical certificates representing the Common Stock issuable upon conversion, provided the Borrower is participating in the Depository Trust Company ("DTC") Fast Automated Securities Transfer ("FAST") program, upon request of the Holder and its compliance with the provisions set forth herein, the Borrower shall use its best efforts to cause its transfer agent to electronically transmit the Common Stock issuable upon conversion to the Holder by crediting the account of Holder's Prime Broker with DTC through its Deposit and Withdrawal at Custodian ("DWAC") system.

(e)     Failure to Deliver Common Stock Prior to Deadline. Without in any way limiting the Holder's right to pursue other remedies, including actual damages and/or equitable relief, the parties agree that if delivery of the Common Stock issuable upon conversion of this Note is not delivered by the Deadline due to action and/or inaction of the Borrower, the Borrower shall pay to the Holder $2,000 per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such Common Stock (the "Fail to Deliver Fee"); provided; however that the Fail to Deliver Fee shall not be due if the failure is a result of a third party (i.e., transfer agent; and not the result of any failure to pay such transfer agent) despite the best efforts of the Borrower to effect delivery of such Common Stock. Such cash amount shall be paid to Holder by the fifth day of the month following the month in which it has accrued or, at the option of the Holder (by written notice to the Borrower by the first day of the month following the month in which it has accrued), shall be added to the principal amount of this Note, in which event interest shall accrue thereon in accordance with the terms of this Note and such additional principal amount shall be convertible into Common Stock in accordance with the terms of this Note. The Borrower agrees that the right to convert is a valuable right to the Holder. The damages resulting from a failure, attempt to frustrate, interference with such conversion right are difficult if not impossible to qualify. Accordingly, the parties acknowledge that the liquidated damages provision contained in this Section 1.4(e) are justified.

1.5     Concerning the Shares. The shares of Common Stock issuable upon conversion of this Note may not be sold or transferred unless: (i) such shares are sold pursuant to an effective registration statement under the Act or (ii) the Borrower or its transfer agent shall have been furnished with an opinion of counsel (which opinion shall be in form, substance and scope customary for opinions

4

of counsel in comparable transactions) to the effect that the shares to be sold or transferred may be sold or transferred pursuant to an exemption from such registration (such as Rule 144 or a successor rule) ("Rule 144"); or (iii) such shares are transferred to an "affiliate" (as defined in Rule 144) of the Borrower who agrees to sell or otherwise transfer the shares only in accordance with this Section 1.5 and who is an Accredited Investor (as defined in the Purchase Agreement).

Any restrictive legend on certificates representing shares of Common Stock issuable upon conversion of this Note shall be removed and the Borrower shall issue to the Holder a new certificate therefore free of any transfer legend if the Borrower or its transfer agent shall have received an opinion of counsel from Holder's counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that (i) a public sale or transfer of such Common Stock may be made without registration under the Act, which opinion shall be accepted by the Company so that the sale or transfer is effected; or (ii) in the case of the Common Stock issuable upon conversion of this Note, such security is registered for sale by the Holder under an effective registration statement filed under the Act; or otherwise may be sold pursuant to an exemption from registration. In the event that the Company does not reasonably accept the opinion of counsel provided by the Holder with respect to the transfer of Securities pursuant to an exemption from registration (such as Rule 144), at the Deadline, it will be considered an Event of Default pursuant to Section 3.2 of the Note.

      1.6    <u>Effect of Certain Events</u>.

        (a)    <u>Effect of Merger, Consolidation, Etc</u>. At the option of the Holder, the sale, conveyance or disposition of all or substantially all of the assets of the Borrower, the effectuation by the Borrower of a transaction or series of related transactions in which more than 50% of the voting power of the Borrower is disposed of, or the consolidation, merger or other business combination of the Borrower with or into any other Person (as defined below) or Persons when the Borrower is not the survivor shall be deemed to be an Event of Default (as defined in Article III) pursuant to which the Borrower shall be required to pay to the Holder upon the consummation of and as a condition to such transaction an amount equal to the Default Amount (as defined in Article III). "Person" shall mean any individual, corporation, limited liability company, partnership, association, trust or other entity or organization.

        (b)    <u>Adjustment Due to Merger, Consolidation, Etc</u>. If, at any time when this Note is issued and outstanding and prior to conversion of all of the Note, there shall be any merger, consolidation, exchange of shares, recapitalization, reorganization, or other similar event, as a result of which shares of Common Stock of the Borrower shall be changed into the same or a different number of shares of another class or classes of stock or securities of the Borrower or another entity, or in case of any sale or conveyance of all or substantially all of the assets of the Borrower other than in connection with a plan of complete liquidation of the Borrower, then the Holder of this Note shall thereafter have the right to receive upon conversion of this Note, upon the basis and upon the terms and conditions specified herein and in lieu of the shares of Common Stock immediately theretofore issuable upon conversion, such stock, securities or assets which the Holder would have been entitled to receive in such transaction had this Note been converted in full immediately prior to such transaction (without regard to any limitations on conversion set forth herein), and in any such case appropriate provisions shall be made with respect to the rights and interests of the Holder of this Note to the end that the provisions hereof (including, without limitation, provisions for adjustment of the Conversion Price and of the number of shares issuable upon conversion of the Note) shall thereafter be applicable, as nearly as may be practicable in relation to any securities or assets thereafter deliverable upon the conversion hereof. The Borrower shall not affect any transaction described in this Section 1.6(b) unless (a) it first gives, to the extent practicable, ten (10)

days prior written notice (but in any event at least five (5) days prior written notice) of the record date of the special meeting of shareholders to approve, or if there is no such record date, the consummation of, such merger, consolidation, exchange of shares, recapitalization, reorganization or other similar event or sale of assets (during which time the Holder shall be entitled to convert this Note) and (b) the resulting successor or acquiring entity (if not the Borrower) assumes by written instrument the obligations of this Note. The above provisions shall similarly apply to successive consolidations, mergers, sales, transfers or share exchanges.

       (c)    <u>Adjustment Due to Distribution</u>. If the Borrower shall declare or make any distribution of its assets (or rights to acquire its assets) to holders of Common Stock as a dividend, stock repurchase, by way of return of capital or otherwise (including any dividend or distribution to the Borrower's shareholders in cash or shares (or rights to acquire shares) of capital stock of a subsidiary (i.e., a spin-off)) (a "Distribution"), then the Holder of this Note shall be entitled, upon any conversion of this Note after the date of record for determining shareholders entitled to such Distribution, to receive the amount of such assets which would have been payable to the Holder with respect to the shares of Common Stock issuable upon such conversion had such Holder been the holder of such shares of Common Stock on the record date for the determination of shareholders entitled to such Distribution.

       1.7    <u>Prepayment</u>. Notwithstanding anything to the contrary contained in this Note, at any time during the periods set forth on the table immediately following this paragraph (the "Prepayment Periods"), the Borrower shall have the right, exercisable on not more than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full, in accordance with this Section 1.7. Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than three (3) Trading Days from the date of the Optional Prepayment Notice. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the Optional Prepayment Amount (as defined below) to Holder, or upon the direction of the Holder as specified by the Holder in a writing to the Borrower (which direction shall to be sent to Borrower by the Holder at least one (1) business day prior to the Optional Prepayment Date). If the Borrower exercises its right to prepay the Note, the Borrower shall make payment to the Holder of an amount in cash equal to the percentage ("Prepayment Percentage") as set forth in the table immediately following this paragraph opposite the applicable Prepayment Period, multiplied by the sum of: (w) the then outstanding principal amount of this Note <u>plus</u> (x) accrued and unpaid interest on the unpaid principal amount of this Note to the Optional Prepayment Date <u>plus</u> (y) Default Interest, if any, on the amounts referred to in clauses (w) and (x) <u>plus</u> (z) any amounts owed to the Holder pursuant to Section 1.4 hereof (the "Optional Prepayment Amount"). If the Borrower delivers an Optional Prepayment Notice and fails to pay the Optional Prepayment Amount due to the Holder of the Note within two (2) business days following the Optional Prepayment Date, the Borrower shall forever forfeit its right to prepay the Note pursuant to this Section 1.7.

| Prepayment Period | Prepayment Percentage |
|---|---|
| 1.    The period beginning on the Issue Date and ending on the date which is thirty (30) days following the Issue Date. | 120% |
| 2.    The period beginning on the date which is thirty-one (31) days following the Issue Date and ending on the date which is sixty (60) days following the Issue Date. | 125% |

| | |
|---|---|
| 3.      The period beginning on the date which is sixty-one (61) days following the Issue Date and ending on the date which is ninety (90) days following the Issue Date. | 130% |
| 4.      The period beginning on the date that is ninety-one (91) day from the Issue Date and ending one hundred twenty (120) days following the Issue Date. | 135% |
| 5.      The period beginning on the date that is one hundred twenty-one (121) day from the Issue Date and ending one hundred fifty (150) days following the Issue Date. | 140% |
| 6.      The period beginning on the date that is one hundred fifty-one (151) day from the Issue Date and ending one hundred eighty (180) days following the Issue Date. | 145% |

After the expiration of one hundred eighty (180) days following the Issue Date, the Borrower shall have no right of prepayment.

## ARTICLE II.  CERTAIN COVENANTS

2.1      Sale of Assets.  So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, sell, lease or otherwise dispose of any significant portion of its assets outside the ordinary course of business.  Any consent to the disposition of any assets may be conditioned on a specified use of the proceeds of disposition.

## ARTICLE III.  EVENTS OF DEFAULT

If any of the following events of default (each, an "Event of Default") shall occur:

3.1      Failure to Pay Principal and Interest.  The Borrower fails to pay the principal hereof or interest thereon when due on this Note, whether at maturity or upon acceleration and such breach continues for a period of five (5) days after written notice from the Holder.

3.2      Conversion and the Shares.  The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for two (2) business days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Borrower to remain current in its obligations to its transfer agent. It shall be an event of default of this Note, if a conversion of this Note is delayed, hindered or frustrated due to a balance

7

owed by the Borrower to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Borrower's transfer agent in order to process a conversion, such advanced funds shall be paid by the Borrower to the Holder within forty-eight (48) hours of a demand from the Holder.

3.3     Breach of Covenants.  The Borrower breaches any material covenant or other material term or condition contained in this Note and any collateral documents including but not limited to the Purchase Agreement and such breach continues for a period of twenty (20) days after written notice thereof to the Borrower from the Holder.

3.4     Breach of Representations and Warranties.  Any representation or warranty of the Borrower made herein or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith (including, without limitation, the Purchase Agreement), shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.5     Receiver or Trustee.  The Borrower or any subsidiary of the Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed.

3.6     Bankruptcy.  Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Borrower or any subsidiary of the Borrower.

3.7     Delisting of Common Stock.  The Borrower shall fail to maintain the listing of the Common Stock on at least one of the OTC (which specifically includes the quotation platforms maintained by the OTC Markets Group) or an equivalent replacement exchange, the Nasdaq National Market, the Nasdaq SmallCap Market, the New York Stock Exchange, or the American Stock Exchange.

3.8     Failure to Comply with the Exchange Act.  The Borrower shall fail to comply with the reporting requirements of the Exchange Act; and/or the Borrower shall cease to be subject to the reporting requirements of the Exchange Act.

3.9     Liquidation.  Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

3.10     Cessation of Operations.     Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

3.11     Financial Statement Restatement.     The restatement of any financial statements filed by the Borrower with the SEC at any time after 180 days after the Issuance Date for any date or period until this Note is no longer outstanding, if the result of such restatement would, by comparison to the un-restated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.12     Replacement of Transfer Agent. In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower.

3.13     Cross-Default. Notwithstanding anything to the contrary contained in this Note or the other related or companion documents, a breach or default by the Borrower of any covenant or other term or condition contained in any of the Other Agreements, after the passage of all applicable notice and cure or grace periods, shall, at the option of the Holder, be considered a default under this Note and the Other Agreements, in which event the Holder shall be entitled (but in no event required) to apply all rights and remedies of the Holder under the terms of this Note and the Other Agreements by reason of a default under said Other Agreement or hereunder. "Other Agreements" means, collectively, all agreements and instruments between, among or by: (1) the Borrower, and, or for the benefit of, (2) the Holder and any affiliate of the Holder, including, without limitation, promissory notes; provided, however, the term "Other Agreements" shall not include the related or companion documents to this Note. Each of the loan transactions will be cross-defaulted with each other loan transaction and with all other existing and future debt of Borrower to the Holder.

Upon the occurrence and during the continuation of any Event of Default specified in Section 3.1 (solely with respect to failure to pay the principal hereof or interest thereon when due at the Maturity Date), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the Default Amount (as defined herein). UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 3.2, THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGATIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT AMOUNT (AS DEFINED HEREIN); MULTIPLIED BY (Z) TWO (2). Upon the occurrence and during the continuation of any Event of Default specified in Sections 3.1 (solely with respect to failure to pay the principal hereof or interest thereon when due on this Note or upon acceleration), 3.3, 3.4, 3.7, 3.8, 3.10, 3.11, 3.12, 3.13, and/or 3.14 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), and upon the occurrence of an Event of Default specified the remaining sections of Articles III (other than failure to pay the principal hereof or interest thereon at the Maturity Date specified in Section 3,1 hereof), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) plus (z) any amounts owed to the Holder pursuant to Section 1.4(e) hereof (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity.

If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of

shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect.

## ARTICLE IV. MISCELLANEOUS

4.1     Failure or Indulgence Not Waiver.  No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges.  All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

4.2     Notices.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

        If to the Borrower, to:

            HEMP NATURALS, INC.
            16950 North Bay Road, Suite 1803
            Sunny Isles Beach, Florida 33160
            Attn: Levi Jacobson, Chief Executive Officer
            Fax:
            Email: hempofnaturals@gmail.com

        If to the Holder:

            POWER UP LENDING GROUP LTD.
            111 Great Neck Road, Suite 214
            Great Neck, NY  11021
            Attn: Curt Kramer, Chief Executive Officer
            e-mail: info@poweruplending.com

      With a copy by fax only to (which copy shall not constitute notice):

            Naidich Wurman LLP
            111 Great Neck Road, Suite 216
            Great Neck, NY  11021
            Attn: Allison Naidich

facsimile: 516-466-3555
e-mail: allison@nwlaw.com

4.3     Amendments.  This Note and any provision hereof may only be amended by an instrument in writing signed by the Borrower and the Holder.  The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument (and the other Notes issued pursuant to the Purchase Agreement) as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4     Most Favored Nation.  During the period where any monies are owed to the Holder pursuant to this Note, if the Borrower engages in any future financing transactions with a third party investor, the Borrower will provide the Holder with written notice (the "MFN Notice") thereof promptly but in no event less than 10 days prior to closing any financing transactions. Included with the MFN Notice shall be a copy of all documentation relating to such financing transaction and shall include, upon written request of the Holder, any additional information related to such subsequent investment as may be reasonably requested by the Holder. In the event the Holder determines that the terms of the subsequent investment are preferable to the terms of the securities of the Borrower issued to the Holder pursuant to the terms of the Purchase Agreement, the Holder will notify the Borrower in writing. Promptly after receipt of such written notice from the Holder, the Borrower agrees to amend and restate the Securities (which may include the conversion terms of this Note), to be identical to the instruments evidencing the subsequent investment. Notwithstanding the foregoing, this Section 4.4 shall not apply in respect of (i) an Exempt Issuance, or (ii) an underwritten public offering of Common Stock. "Exempt Issuance" means the issuance of: (a) shares of Common Stock or options to employees, officers, consultants, advisors or directors of the Borrower pursuant to any stock or option plan duly adopted for such purpose by a majority of the members of the Board of Directors or a majority of the members of a committee of directors established for such purpose, (b) securities upon the exercise or exchange of or conversion of this Note and/or other securities exercisable or exchangeable for or convertible into shares of Common Stock issued and outstanding on the date hereof, and (c) securities issued pursuant to acquisitions or strategic transactions approved by a majority of the disinterested directors of the Borrower, provided that any such issuance shall only be to a Person which is, itself or through its subsidiaries, an operating company in a business synergistic with the business of the Borrower and in which the Borrower receives benefits in addition to the investment of funds, but shall not include a transaction in which the Borrower is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities.

4.5     Assignability.  This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns.  Each transferee of this Note must be an "accredited investor" (as defined in Rule 501(a) of the Securities and Exchange Commission).  Notwithstanding anything in this Note to the contrary, this Note may be pledged as collateral in connection with a bona fide margin account or other lending arrangement; and may be assigned by the Holder without the consent of the Borrower.

4.6     Cost of Collection.  If default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees.

4.7     Governing Law.  This Note shall be governed by and construed in accordance with the laws of the State of Virginia without regard to principles of conflicts of laws.  Any action brought by either party against the other concerning the transactions contemplated by this Note shall be brought only in the state courts of New York or in the federal courts located in the Eastern District of New York.

The parties to this Note hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. The Borrower and Holder waive trial by jury. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Note or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Note, any agreement or any other document delivered in connection with this Note by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

        4.8   <u>Purchase Agreement</u>. By its acceptance of this Note, each party agrees to be bound by the applicable terms of the Purchase Agreement.

        4.9   <u>Remedies</u>. The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

        IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by its duly authorized officer this on December 6, 2018

**HEMP NATURALS, INC.**

By: _____
    Levi Jacobson
    Chief Executive Officer

**EXHIBIT A -- NOTICE OF CONVERSION**

The undersigned hereby elects to convert $_____ principal amount of the Note (defined below) into that number of shares of Common Stock to be issued pursuant to the conversion of the Note ("Common Stock") as set forth below, of HEMP NATURALS, INC., a Delaware corporation (the "Borrower") according to the conditions of the convertible note of the Borrower dated as of December 6, 2018 (the "Note"), as of the date written below.  No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[ ]     The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system ("DWAC Transfer").

Name of DTC Prime Broker:
Account Number:

[ ]     The undersigned hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

POWER UP LENDING GROUP LTD.
111 Great Neck Road, Suite 214
Great Neck, NY  11021
Attention: Certificate Delivery
e-mail: info@poweruplendinggroup.com

Date of conversion:                                       _____
Applicable Conversion Price:                        $_____
Number of shares of common stock to be issued
    pursuant to conversion of the Notes:        _____
Amount of Principal Balance due remaining
    under the Note after this conversion:         _____

POWER UP LENDING GROUP LTD.

By:_____
Name:  Curt Kramer
Title:   Chief Executive Officer
              Date: _____

13



NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

**Principal Amount: $68,000.00**                        **Issue Date: March 14, 2019**
**Purchase Price:  $68,000.00**

## CONVERTIBLE PROMISSORY NOTE

**FOR VALUE RECEIVED, HEMP NATURALS, INC.**, a Delaware corporation (hereinafter called the "Borrower"), hereby promises to pay to the order of **POWER UP LENDING GROUP LTD.**, a Virginia corporation, or registered assigns (the "Holder") the sum of $68,000.00 together with any interest as set forth herein, on March 14, 2020 (the "Maturity Date"), and to pay interest on the unpaid principal balance hereof at the rate of twelve percent (12%)(the "Interest Rate") per annum from the date hereof (the "Issue Date") until the same becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise.  This Note may not be prepaid in whole or in part except as otherwise explicitly set forth herein. Any amount of principal or interest on this Note which is not paid when due shall bear interest at the rate of twenty two percent (22%) per annum from the due date thereof until the same is paid ("Default Interest"). Interest shall be computed on the basis of a 365 day year and the actual number of days elapsed. Interest shall commence accruing on the Issue Date but shall not be payable until the Note becomes payable (whether at Maturity Date or upon acceleration or by prepayment). All payments due hereunder (to the extent not converted into common stock, $0.0001 par value per share (the "Common Stock") in accordance with the terms hereof) shall be made in lawful money of the United States of America. All payments shall be made at such address as the Holder shall hereafter give to the Borrower by written notice made in accordance with the provisions of this Note. Each capitalized term used herein, and not otherwise defined, shall have the meaning ascribed thereto in that certain Securities Purchase Agreement dated the date hereof, pursuant to which this Note was originally issued (the "Purchase Agreement").

This Note is free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Borrower and will not impose personal liability upon the holder thereof.

The following terms shall apply to this Note:

## ARTICLE I. CONVERSION RIGHTS

1.1     Conversion Right.  The Holder shall have the right from time to time, and at any time during the period beginning on the date which is one hundred eighty (180) days following the date of this Note and ending on the later of: (i) the Maturity Date and (ii) the date of payment of the Default

Amount (as defined in Article III), each in respect of the remaining outstanding amount of this Note to convert all or any part of the outstanding and unpaid principal amount of this Note into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified at the conversion price  (the "Conversion Price") determined as provided herein (a "Conversion"); provided, however, that in no event shall the Holder be entitled to convert any portion of this Note in excess of that portion of this Note upon conversion of which the sum of (1) the number of shares of Common Stock beneficially owned by the Holder and its affiliates (other than shares of Common Stock which may be deemed beneficially owned through the ownership of the unconverted portion of the Notes or the unexercised or unconverted portion of any other security of the Borrower subject to a limitation on conversion or exercise analogous to the limitations contained herein) and (2) the number of shares of Common Stock issuable upon the conversion of the portion of this Note with respect to which the determination of this proviso is being made, would result in beneficial ownership by the Holder and its affiliates of more than 4.99% of the outstanding shares of Common Stock.  For purposes of the proviso to the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Regulations 13D-G thereunder, except as otherwise provided in clause (1) of such proviso. <u>The beneficial ownership limitations on conversion as set forth in the section may NOT be waived by the Holder</u>. The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing the Conversion Amount (as defined below) by the applicable Conversion Price then in effect on the date specified in the notice of conversion, in the form attached hereto as Exhibit A (the "Notice of Conversion"), delivered to the Borrower by the Holder in accordance with Section 1.4 below; provided that the Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in, or reasonably expected to result in, notice) to the Borrower before 6:00 p.m., New York, New York time on such conversion date (the "Conversion Date"); however,  if the Notice of Conversion is sent after 6:00pm, New York, New York time the Conversion Date shall be the next business day. The term "Conversion Amount" means, with respect to any conversion of this Note, the sum of (1) the principal amount of this Note to be converted in such conversion <u>plus</u> (2) at the Holder's option, accrued and unpaid interest, if any, on such principal amount at the interest rates provided in this Note to the Conversion Date, <u>plus</u> (3) at the Holder's option, Default Interest, if any, on the amounts referred to in the immediately preceding clauses (1) and/or (2) <u>plus</u> (4) at the Holder's option, any amounts owed to the Holder pursuant to Sections 1.4 hereof.

      1.2   <u>Conversion Price</u>.  The conversion price (the "Conversion Price") shall equal the Variable Conversion Price (as defined herein) (subject to equitable adjustments by the Borrower relating to the Borrower's securities or the securities of any subsidiary of the Borrower, combinations, recapitalization, reclassifications, extraordinary distributions and similar events).    The "Variable Conversion Price" shall mean 55% multiplied by the Market Price (as defined herein) (representing a discount rate of 45%). "Market Price" means the lowest one (1) Trading Price (as defined below) for the Common Stock during the twenty (20) Trading Day period ending on the latest complete Trading Day prior to the Conversion Date.  "Trading Price" means, for any security as of any date, the closing bid price on the OTCQB, OTCQX, Pink Sheets electronic quotation system or applicable trading market (the "OTC") as reported by a reliable reporting service ("Reporting Service") designated by the Holder (i.e. Bloomberg) or, if the OTC is not the principal trading market for such security, the closing bid price of such security on the principal securities exchange or trading market where such security is listed or traded or, if no closing bid price of such security is available in any of the foregoing manners, the average of the closing bid prices of any market makers for such security that are listed in the "pink sheets". If the Trading Price cannot be calculated for such security on such date in the manner provided above, the Trading Price shall be the fair market value as reasonably determined by the Borrower. "Trading Day" shall mean any day on which the

Common Stock is tradable for any period on the OTC, or on the principal securities exchange or other securities market on which the Common Stock is then being traded.

 1.3 <u>Authorized Shares</u>. The Borrower covenants that during the period the conversion right exists, the Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Stock upon the full conversion of this Note issued pursuant to the Purchase Agreement.  The Borrower is required at all times to have authorized and reserved ten times the number of shares that would be issuable upon full conversion of the Note (assuming that the 4.99% limitation set forth in Section 1.1 is not in effect)(based on the respective Conversion Price of the Note (as defined in Section 1.2) in effect from time to time, initially 2,979,189)(the "Reserved Amount").  The Reserved Amount shall be increased (or decreased with the written consent of the Holder) from time to time in accordance with the Borrower's obligations hereunder.  The Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable.  In addition, if the Borrower shall issue any securities or make any change to its capital structure which would change the number of shares of Common Stock into which the Notes shall be convertible at the then current Conversion Price, the Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved, free from preemptive rights, for conversion of the outstanding Note.  The Borrower (i) acknowledges that it has irrevocably instructed its transfer agent to issue certificates for the Common Stock issuable upon conversion of this Note, and (ii) agrees that its issuance of this Note shall constitute full authority to its officers and agents who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Common Stock in accordance with the terms and conditions of this Note.

 If, at any time the Borrower does not maintain the Reserved Amount it will be considered an Event of Default under Section 3.2 of the Note.

 1.4 <u>Method of Conversion</u>.

 (a) <u>Mechanics of Conversion</u>.  As set forth in Section 1.1 hereof, from time to time, and at any time during the period beginning on the date which is one hundred eighty (180) days following the date of this Note and ending on the later of: (i) the Maturity Date and (ii) the date of payment of the Default Amount, this Note may be converted by the Holder in whole or in part at any time from time to time after the Issue Date, by (A) submitting to the Borrower a Notice of Conversion (by facsimile, e-mail or other reasonable means of communication dispatched on the Conversion Date prior to 6:00 p.m., New York, New York time) and (B) subject to Section 1.4(b), surrendering this Note at the principal office of the Borrower (upon payment in full of any amounts owed hereunder).

 (b) <u>Surrender of Note Upon Conversion</u>.  Notwithstanding anything to the contrary set forth herein, upon conversion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Borrower unless the entire unpaid principal amount of this Note is so converted.  The Holder and the Borrower shall maintain records showing the principal amount so converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Borrower, so as not to require physical surrender of this Note upon each such conversion.

 (c) <u>Delivery of Common Stock Upon Conversion</u>.  Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this

3

Section 1.4, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Common Stock issuable upon such conversion within two (2) business days after such receipt (the "Deadline") (and, solely in the case of conversion of the entire unpaid principal amount hereof, surrender of this Note) in accordance with the terms hereof and the Purchase Agreement. Upon receipt by the Borrower of a Notice of Conversion, the Holder shall be deemed to be the holder of record of the Common Stock issuable upon such conversion, the outstanding principal amount and the amount of accrued and unpaid interest on this Note shall be reduced to reflect such conversion, and, unless the Borrower defaults on its obligations hereunder, all rights with respect to the portion of this Note being so converted shall forthwith terminate except the right to receive the Common Stock or other securities, cash or other assets, as herein provided, on such conversion. If the Holder shall have given a Notice of Conversion as provided herein, the Borrower's obligation to issue and deliver the certificates for Common Stock shall be absolute and unconditional, irrespective of the absence of any action by the Holder to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against any person or any action to enforce the same, any failure or delay in the enforcement of any other obligation of the Borrower to the holder of record, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder of any obligation to the Borrower, and irrespective of any other circumstance which might otherwise limit such obligation of the Borrower to the Holder in connection with such conversion.

(d)     Delivery of Common Stock by Electronic Transfer.  In lieu of delivering physical certificates representing the Common Stock issuable upon conversion, provided the Borrower is participating in the Depository Trust Company ("DTC") Fast Automated Securities Transfer ("FAST") program, upon request of the Holder and its compliance with the provisions set forth herein, the Borrower shall use its best efforts to cause its transfer agent to electronically transmit the Common Stock issuable upon conversion to the Holder by crediting the account of Holder's Prime Broker with DTC through its Deposit and Withdrawal at Custodian ("DWAC") system.

(e)     Failure to Deliver Common Stock Prior to Deadline.  Without in any way limiting the Holder's right to pursue other remedies, including actual damages and/or equitable relief, the parties agree that if delivery of the Common Stock issuable upon conversion of this Note is not delivered by the Deadline due to action and/or inaction of the Borrower, the Borrower shall pay to the Holder $2,000 per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such Common Stock (the "Fail to Deliver Fee"); provided; however that the Fail to Deliver Fee shall not be due if the failure is a result of a third party (i.e., transfer agent; and not the result of any failure to pay such transfer agent) despite the best efforts of the Borrower to effect delivery of such Common Stock.  Such cash amount shall be paid to Holder by the fifth day of the month following the month in which it has accrued or, at the option of the Holder (by written notice to the Borrower by the first day of the month following the month in which it has accrued), shall be added to the principal amount of this Note, in which event interest shall accrue thereon in accordance with the terms of this Note and such additional principal amount shall be convertible into Common Stock in accordance with the terms of this Note. The Borrower agrees that the right to convert is a valuable right to the Holder.  The damages resulting from a failure, attempt to frustrate, interference with such conversion right are difficult if not impossible to qualify. Accordingly, the parties acknowledge that the liquidated damages provision contained in this Section 1.4(e) are justified.

1.5     Concerning the Shares.  The shares of Common Stock issuable upon conversion of this Note may not be sold or transferred unless: (i) such shares are sold pursuant to an effective registration statement under the Act or (ii) the Borrower or its transfer agent shall have been furnished with an opinion of counsel (which opinion shall be in form, substance and scope customary for opinions

4

of counsel in comparable transactions) to the effect that the shares to be sold or transferred may be sold or transferred pursuant to an exemption from such registration (such as Rule 144 or a successor rule) ("Rule 144"); or (iii) such shares are transferred to an "affiliate" (as defined in Rule 144) of the Borrower who agrees to sell or otherwise transfer the shares only in accordance with this Section 1.5 and who is an Accredited Investor (as defined in the Purchase Agreement).

Any restrictive legend on certificates representing shares of Common Stock issuable upon conversion of this Note shall be removed and the Borrower shall issue to the Holder a new certificate therefore free of any transfer legend if the Borrower or its transfer agent shall have received an opinion of counsel from Holder's counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that (i) a public sale or transfer of such Common Stock may be made without registration under the Act, which opinion shall be accepted by the Company so that the sale or transfer is effected; or (ii) in the case of the Common Stock issuable upon conversion of this Note, such security is registered for sale by the Holder under an effective registration statement filed under the Act; or otherwise may be sold pursuant to an exemption from registration.  In the event that the Company does not reasonably accept the opinion of counsel provided by the Holder with respect to the transfer of Securities pursuant to an exemption from registration (such as Rule 144), at the Deadline, it will be considered an Event of Default pursuant to Section 3.2 of the Note.

     1.6    <u>Effect of Certain Events</u>.

     (a)    <u>Effect of Merger, Consolidation, Etc</u>.  At the option of the Holder, the sale, conveyance or disposition of all or substantially all of the assets of the Borrower, the effectuation by the Borrower of a transaction or series of related transactions in which more than 50% of the voting power of the Borrower is disposed of, or the consolidation, merger or other business combination of the Borrower with or into any other Person (as defined below) or Persons when the Borrower is not the survivor shall be deemed to be an Event of Default (as defined in Article III) pursuant to which the Borrower shall be required to pay to the Holder upon the consummation of and as a condition to such transaction an amount equal to the Default Amount (as defined in Article III).  "Person" shall mean any individual, corporation, limited liability company, partnership, association, trust or other entity or organization.

     (b)    <u>Adjustment Due to Merger, Consolidation, Etc</u>.  If, at any time when this Note is issued and outstanding and prior to conversion of all of the Note, there shall be any merger, consolidation, exchange of shares, recapitalization, reorganization, or other similar event, as a result of which shares of Common Stock of the Borrower shall be changed into the same or a different number of shares of another class or classes of stock or securities of the Borrower or another entity, or in case of any sale or conveyance of all or substantially all of the assets of the Borrower other than in connection with a plan of complete liquidation of the Borrower, then the Holder of this Note shall thereafter have the right to receive upon conversion of this Note, upon the basis and upon the terms and conditions specified herein and in lieu of the shares of Common Stock immediately theretofore issuable upon conversion, such stock, securities or assets which the Holder would have been entitled to receive in such transaction had this Note been converted in full immediately prior to such transaction (without regard to any limitations on conversion set forth herein), and in any such case appropriate provisions shall be made with respect to the rights and interests of the Holder of this Note to the end that the provisions hereof (including, without limitation, provisions for adjustment of the Conversion Price and of the number of shares issuable upon conversion of the Note) shall thereafter be applicable, as nearly as may be practicable in relation to any securities or assets thereafter deliverable upon the conversion hereof.  The Borrower shall not affect any transaction described in this Section 1.6(b) unless (a) it first gives, to the extent practicable, ten (10)

days prior written notice (but in any event at least five (5) days prior written notice) of the record date of the special meeting of shareholders to approve, or if there is no such record date, the consummation of, such merger, consolidation, exchange of shares, recapitalization, reorganization or other similar event or sale of assets (during which time the Holder shall be entitled to convert this Note) and (b) the resulting successor or acquiring entity (if not the Borrower) assumes by written instrument the obligations of this Note. The above provisions shall similarly apply to successive consolidations, mergers, sales, transfers or share exchanges.

(c)     Adjustment Due to Distribution.  If the Borrower shall declare or make any distribution of its assets (or rights to acquire its assets) to holders of Common Stock as a dividend, stock repurchase, by way of return of capital or otherwise (including any dividend or distribution to the Borrower's shareholders in cash or shares (or rights to acquire shares) of capital stock of a subsidiary (i.e., a spin-off)) (a "Distribution"), then the Holder of this Note shall be entitled, upon any conversion of this Note after the date of record for determining shareholders entitled to such Distribution, to receive the amount of such assets which would have been payable to the Holder with respect to the shares of Common Stock issuable upon such conversion had such Holder been the holder of such shares of Common Stock on the record date for the determination of shareholders entitled to such Distribution.

1.7     Prepayment.  Notwithstanding anything to the contrary contained in this Note, at any time during the periods set forth on the table immediately following this paragraph (the "Prepayment Periods"), the Borrower shall have the right, exercisable on not more than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full, in accordance with this Section 1.7.  Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than three (3) Trading Days from the date of the Optional Prepayment Notice. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the Optional Prepayment Amount (as defined below) to Holder, or upon the direction of the Holder as specified by the Holder in a writing to the Borrower (which direction shall to be sent to Borrower by the Holder at least one (1) business day prior to the Optional Prepayment Date). If the Borrower exercises its right to prepay the Note, the Borrower shall make payment to the Holder of an amount in cash equal to the percentage ("Prepayment Percentage") as set forth in the table immediately following this paragraph opposite the applicable Prepayment Period, multiplied by the sum of: (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the Optional Prepayment Date plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and (x) plus (z) any amounts owed to the Holder pursuant to Section 1.4 hereof (the "Optional Prepayment Amount").  If the Borrower delivers an Optional Prepayment Notice and fails to pay the Optional Prepayment Amount due to the Holder of the Note within two (2) business days following the Optional Prepayment Date, the Borrower shall forever forfeit its right to prepay the Note pursuant to this Section 1.7.

| Prepayment Period | Prepayment Percentage |
|---|---|
| 1.     The period beginning on the Issue Date and ending on the date which is thirty (30) days following the Issue Date. | 120% |
| 2.     The period beginning on the date which is thirty-one (31) days following the Issue Date and ending on the date which is sixty (60) days following the Issue Date. | 125% |

| | |
|---|---|
| 3.    The period beginning on the date which is sixty-one (61) days following the Issue Date and ending on the date which is ninety (90) days following the Issue Date. | 130% |
| 4.    The period beginning on the date that is ninety-one (91) day from the Issue Date and ending one hundred twenty (120) days following the Issue Date. | 135% |
| 5.    The period beginning on the date that is one hundred twenty-one (121) day from the Issue Date and ending one hundred fifty (150) days following the Issue Date. | 140% |
| 6.    The period beginning on the date that is one hundred fifty-one (151) day from the Issue Date and ending one hundred eighty (180) days following the Issue Date. | 145% |

After the expiration of one hundred eighty (180) days following the Issue Date, the Borrower shall have no right of prepayment.

## ARTICLE II.  CERTAIN COVENANTS

2.1     Sale of Assets.  So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, sell, lease or otherwise dispose of any significant portion of its assets outside the ordinary course of business.  Any consent to the disposition of any assets may be conditioned on a specified use of the proceeds of disposition.

## ARTICLE III.  EVENTS OF DEFAULT

If any of the following events of default (each, an "Event of Default") shall occur:

3.1     Failure to Pay Principal and Interest.  The Borrower fails to pay the principal hereof or interest thereon when due on this Note, whether at maturity or upon acceleration and such breach continues for a period of five (5) days after written notice from the Holder.

3.2     Conversion and the Shares.  The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for two (2) business days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Borrower to remain current in its obligations to its transfer agent. It shall be an event of default of this Note, if a conversion of this Note is delayed, hindered or frustrated due to a balance

7

owed by the Borrower to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Borrower's transfer agent in order to process a conversion, such advanced funds shall be paid by the Borrower to the Holder within forty-eight (48) hours of a demand from the Holder.

3.3    Breach of Covenants.  The Borrower breaches any material covenant or other material term or condition contained in this Note and any collateral documents including but not limited to the Purchase Agreement and such breach continues for a period of twenty (20) days after written notice thereof to the Borrower from the Holder.

3.4    Breach of Representations and Warranties.  Any representation or warranty of the Borrower made herein or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith (including, without limitation, the Purchase Agreement), shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.5    Receiver or Trustee.  The Borrower or any subsidiary of the Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed.

3.6    Bankruptcy.  Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Borrower or any subsidiary of the Borrower.

3.7    Delisting of Common Stock.  The Borrower shall fail to maintain the listing of the Common Stock on at least one of the OTC (which specifically includes the quotation platforms maintained by the OTC Markets Group) or an equivalent replacement exchange, the Nasdaq National Market, the Nasdaq SmallCap Market, the New York Stock Exchange, or the American Stock Exchange.

3.8    Failure to Comply with the Exchange Act.  The Borrower shall fail to comply with the reporting requirements of the Exchange Act; and/or the Borrower shall cease to be subject to the reporting requirements of the Exchange Act.

3.9    Liquidation.  Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

3.10    Cessation of Operations.    Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

3.11    Financial Statement Restatement.    The restatement of any financial statements filed by the Borrower with the SEC at any time after 180 days after the Issuance Date for any date or period until this Note is no longer outstanding, if the result of such restatement would, by comparison to the un-restated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

8

3.12     Replacement of Transfer Agent. In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower.

3.13     Cross-Default. Notwithstanding anything to the contrary contained in this Note or the other related or companion documents, a breach or default by the Borrower of any covenant or other term or condition contained in any of the Other Agreements, after the passage of all applicable notice and cure or grace periods, shall, at the option of the Holder, be considered a default under this Note and the Other Agreements, in which event the Holder shall be entitled (but in no event required) to apply all rights and remedies of the Holder under the terms of this Note and the Other Agreements by reason of a default under said Other Agreement or hereunder. "Other Agreements" means, collectively, all agreements and instruments between, among or by: (1) the Borrower, and, or for the benefit of, (2) the Holder and any affiliate of the Holder, including, without limitation, promissory notes; provided, however, the term "Other Agreements" shall not include the related or companion documents to this Note. Each of the loan transactions will be cross-defaulted with each other loan transaction and with all other existing and future debt of Borrower to the Holder.

Upon the occurrence and during the continuation of any Event of Default specified in Section 3.1 (solely with respect to failure to pay the principal hereof or interest thereon when due at the Maturity Date), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the Default Amount (as defined herein). UPON THE OCCURRENCE AND DURING THE CONTINUATION OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 3.2, THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGATIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT AMOUNT (AS DEFINED HEREIN); MULTIPLIED BY (Z) TWO (2). Upon the occurrence and during the continuation of any Event of Default specified in Sections 3.1 (solely with respect to failure to pay the principal hereof or interest thereon when due on this Note or upon acceleration), 3.3, 3.4, 3.7, 3.8, 3.10, 3.11, 3.12, 3.13, and/or 3.14 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), and upon the occurrence of an Event of Default specified the remaining sections of Articles III (other than failure to pay the principal hereof or interest thereon at the Maturity Date specified in Section 3,1 hereof), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) plus (z) any amounts owed to the Holder pursuant to Section 1.4(e) hereof (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity.

If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long and to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of

shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect.

## ARTICLE IV. MISCELLANEOUS

    4.1    <u>Failure or Indulgence Not Waiver</u>. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

    4.2    <u>Notices</u>. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

    If to the Borrower, to:

        HEMP NATURALS, INC.
        16950 North Bay Road, Suite 1803
        Sunny Isles Beach, Florida 33160
        Attn: Levi Jacobson, Chief Executive Officer
        Fax:
        Email: hempofnaturals@gmail.com

    If to the Holder:

        POWER UP LENDING GROUP LTD.
        111 Great Neck Road, Suite 214
        Great Neck, NY  11021
        Attn: Curt Kramer, Chief Executive Officer
        e-mail: info@poweruplending.com

    With a copy by fax only to (which copy shall not constitute notice):

        Naidich Wurman LLP
        111 Great Neck Road, Suite 216
        Great Neck, NY  11021
        Attn: Allison Naidich

facsimile: 516-466-3555
e-mail: allison@nwlaw.com

4.3    <u>Amendments</u>.  This Note and any provision hereof may only be amended by an instrument in writing signed by the Borrower and the Holder.  The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument (and the other Notes issued pursuant to the Purchase Agreement) as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4    <u>Most Favored Nation</u>.  During the period where any monies are owed to the Holder pursuant to this Note, if the Borrower engages in any future financing transactions with a third party investor, the Borrower will provide the Holder with written notice (the "MFN Notice") thereof promptly but in no event less than 10 days prior to closing any financing transactions. Included with the MFN Notice shall be a copy of all documentation relating to such financing transaction and shall include, upon written request of the Holder, any additional information related to such subsequent investment as may be reasonably requested by the Holder. In the event the Holder determines that the terms of the subsequent investment are preferable to the terms of the securities of the Borrower issued to the Holder pursuant to the terms of the Purchase Agreement, the Holder will notify the Borrower in writing. Promptly after receipt of such written notice from the Holder, the Borrower agrees to amend and restate the Securities (which may include the conversion terms of this Note), to be identical to the instruments evidencing the subsequent investment.  Notwithstanding the foregoing, this Section 4.4 shall not apply in respect of (i) an Exempt Issuance, or (ii) an underwritten public offering of Common Stock. **"Exempt Issuance"** means the issuance of: (a) shares of Common Stock or options to employees, officers, consultants, advisors or directors of the Borrower pursuant to any stock or option plan duly adopted for such purpose by a majority of the members of the Board of Directors or a majority of the members of a committee of directors established for such purpose, (b) securities upon the exercise or exchange of or conversion of this Note and/or other securities exercisable or exchangeable for or convertible into shares of Common Stock issued and outstanding on the date hereof, and (c) securities issued pursuant to acquisitions or strategic transactions approved by a majority of the disinterested directors of the Borrower, provided that any such issuance shall only be to a Person which is, itself or through its subsidiaries, an operating company in a business synergistic with the business of the Borrower and in which the Borrower receives benefits in addition to the investment of funds, but shall not include a transaction in which the Borrower is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities.

4.5    <u>Assignability</u>.  This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns.  Each transferee of this Note must be an "accredited investor" (as defined in Rule 501(a) of the Securities and Exchange Commission).  Notwithstanding anything in this Note to the contrary, this Note may be pledged as collateral in connection with a <u>bona fide</u> margin account or other lending arrangement; and may be assigned by the Holder without the consent of the Borrower.

4.6    <u>Cost of Collection</u>.  If default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees.

4.7    <u>Governing Law</u>.  This Note shall be governed by and construed in accordance with the laws of the State of Virginia without regard to principles of conflicts of laws.  Any action brought by either party against the other concerning the transactions contemplated by this Note shall be brought only in the state courts of New York or in the federal courts located in the Eastern District of New York.

The parties to this Note hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. The Borrower and Holder waive trial by jury. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Note or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Note, any agreement or any other document delivered in connection with this Note by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

        4.8    <u>Purchase Agreement</u>. By its acceptance of this Note, each party agrees to be bound by the applicable terms of the Purchase Agreement.

        4.9    <u>Remedies</u>. The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

    IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by its duly authorized officer this on March 14, 2019

**HEMP NATURALS, INC.**

By: _____
    Levi Jacobson
    Chief Executive Officer

**EXHIBIT A -- NOTICE OF CONVERSION**

The undersigned hereby elects to convert $_____ principal amount of the Note (defined below) into that number of shares of Common Stock to be issued pursuant to the conversion of the Note ("Common Stock") as set forth below, of HEMP NATURALS, INC., a Delaware corporation (the "Borrower") according to the conditions of the convertible note of the Borrower dated as of March 14, 2019 (the "Note"), as of the date written below.  No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[ ]   The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system ("DWAC Transfer").

Name of DTC Prime Broker:
Account Number:

[ ]   The undersigned hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

POWER UP LENDING GROUP LTD.
111 Great Neck Road, Suite 214
Great Neck, NY  11021
Attention: Certificate Delivery
e-mail: info@poweruplendinggroup.com

Date of conversion:                                         _____
Applicable Conversion Price:                         $_____
Number of shares of common stock to be issued
    pursuant to conversion of the Notes:          _____
Amount of Principal Balance due remaining
    under the Note after this conversion:         _____

POWER UP LENDING GROUP LTD.

By:_____
Name:  Curt Kramer
Title:   Chief Executive Officer
            Date: _____

13

## SECURITIES PURCHASE AGREEMENT

This **SECURITIES PURCHASE AGREEMENT** (the "Agreement"), dated as of December 6, 2018, by and between **HEMP NATURALS, INC.**, a Delaware corporation, with its address at 16950 North Bay Road, Suite 1803, Sunny Isles Beach, Florida 33160 (the "Company"), and **POWER UP LENDING GROUP LTD.**, a Virginia corporation, with its address at 111 Great Neck Road, Suite 216, Great Neck, NY 11021 (the "Buyer").

### WHEREAS:

A.      The Company and the Buyer are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by the rules and regulations as promulgated by the United States Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "1933 Act"); and

B.      Buyer desires to purchase and the Company desires to issue and sell, upon the terms and conditions set forth in this Agreement a convertible note of the Company, in the form attached hereto as Exhibit A, in the aggregate principal amount of $43,000.00 (together with any note(s) issued in replacement thereof or as a dividend thereon or otherwise with respect thereto in accordance with the terms thereof, the "Note"), convertible into shares of common stock, $0.0001 par value per share, of the Company (the "Common Stock"), upon the terms and subject to the limitations and conditions set forth in such Note.

**NOW THEREFORE**, the Company and the Buyer severally (and not jointly) hereby agree as follows:

1.      Purchase and Sale of Note.

a.      Purchase of Note.  On the Closing Date (as defined below), the Company shall issue and sell to the Buyer and the Buyer agrees to purchase from the Company such principal amount of Note as is set forth immediately below the Buyer's name on the signature pages hereto.

b.      Form of Payment.  On the Closing Date (as defined below), (i) the Buyer shall pay the purchase price for the Note to be issued and sold to it at the Closing (as defined below) (the "Purchase Price") by wire transfer of immediately available funds to the Company, in accordance with the Company's written wiring instructions, against delivery of the Note in the principal amount equal to the Purchase Price as is set forth immediately below the Buyer's name on the signature pages hereto, and (ii) the Company shall deliver such duly executed Note on behalf of the Company, to the Buyer, against delivery of such Purchase Price.

c.      Closing Date.  Subject to the satisfaction (or written waiver) of the conditions thereto set forth in Section 6 and Section 7 below, the date and time of the issuance and sale of the Note pursuant to this Agreement (the "Closing Date") shall be 12:00 noon, Eastern Standard Time on or about December 7, 2018, or such other mutually agreed upon time.  The closing of the transactions

contemplated by this Agreement (the "Closing") shall occur on the Closing Date at such location as may be agreed to by the parties.

       2.     <u>Buyer's Representations and Warranties.</u>  The Buyer represents and warrants to the Company that:

       a.     <u>Investment Purpose.</u>  As of the date hereof, the Buyer is purchasing the Note and the shares of Common Stock issuable upon conversion of or otherwise pursuant to the Note (such shares of Common Stock being collectively referred to herein as the "Conversion Shares" and, collectively with the Note, the "Securities") for its own account and not with a present view towards the public sale or distribution thereof, except pursuant to sales registered or exempted from registration under the 1933 Act.

       b.     <u>Accredited Investor Status.</u>  The Buyer is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D (an "Accredited Investor").

       c.     <u>Reliance on Exemptions.</u>  The Buyer understands that the Securities are being offered and sold to it in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying upon the truth and accuracy of, and the Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of the Buyer to acquire the Securities.

       d.     <u>Information.</u>  The Company has not disclosed to the Buyer any material nonpublic information and will not disclose such information unless such information is disclosed to the public prior to or promptly following such disclosure to the Buyer.

       e.     <u>Legends.</u>  The Buyer understands that the Note and, until such time as the Conversion Shares have been registered under the 1933 Act; or may be sold pursuant to an applicable exemption from registration, the Conversion Shares may bear a restrictive legend in substantially the following form:

       "THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE PLEDGED, SOLD, ASSIGNED, HYPOTHECATED OR OTHERWISE TRANSFERRED UNLESS (1) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR (2) THE ISSUER OF SUCH SECURITIES RECEIVES AN OPINION OF COUNSEL TO THE HOLDER OF SUCH SECURITIES, WHICH COUNSEL AND OPINION ARE REASONABLY ACCEPTABLE TO THE ISSUER'S TRANSFER AGENT, THAT SUCH SECURITIES MAY BE PLEDGED, SOLD, ASSIGNED, HYPOTHECATED OR OTHERWISE

TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS."

The legend set forth above shall be removed and the Company shall issue a certificate without such legend to the holder of any Security upon which it is stamped, if, unless otherwise required by applicable state securities laws, (a) such Security is registered for sale under an effective registration statement filed under the 1933 Act or otherwise may be sold pursuant to an exemption from registration without any restriction as to the number of securities as of a particular date that can then be immediately sold, or (b) such holder provides the Company with an opinion of counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that a public sale or transfer of such Security may be made without registration under the 1933 Act, which opinion shall be accepted by the Company so that the sale or transfer is effected. The Buyer agrees to sell all Securities, including those represented by a certificate(s) from which the legend has been removed, in compliance with applicable prospectus delivery requirements, if any. In the event that the Company does not accept the opinion of counsel provided by the Buyer with respect to the transfer of Securities pursuant to an exemption from registration, such as Rule 144, at the Deadline, it will be considered an Event of Default pursuant to Section 3.2 of the Note; provided such opinion complies with the Irrevocable Transfer Agent Instructions (as defined herein).

f.      Authorization; Enforcement. This Agreement has been duly and validly authorized. This Agreement has been duly executed and delivered on behalf of the Buyer, and this Agreement constitutes a valid and binding agreement of the Buyer enforceable in accordance with its terms.

3.      Representations and Warranties of the Company. The Company represents and warrants to the Buyer that:

a.      Organization and Qualification. The Company and each of its Subsidiaries (as defined below), if any, is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, with full power and authority (corporate and other) to own, lease, use and operate its properties and to carry on its business as and where now owned, leased, used, operated and conducted. "Subsidiaries" means any corporation or other organization, whether incorporated or unincorporated, in which the Company owns, directly or indirectly, any equity or other ownership interest.

b.      Authorization; Enforcement. (i) The Company has all requisite corporate power and authority to enter into and perform this Agreement, the Note and to consummate the transactions contemplated hereby and thereby and to issue the Securities, in accordance with the terms hereof and thereof, (ii) the execution and delivery of this Agreement, the Note by the Company and the consummation by it of the transactions contemplated hereby and thereby (including without limitation, the issuance of the Note and the issuance and reservation for issuance of the Conversion Shares issuable upon conversion or exercise thereof) have been duly authorized by the Company's Board of Directors and

no further consent or authorization of the Company, its Board of Directors, or its shareholders is required, (iii) this Agreement has been duly executed and delivered by the Company by its authorized representative, and such authorized representative is the true and official representative with authority to sign this Agreement and the other documents executed in connection herewith and bind the Company accordingly, and (iv) this Agreement constitutes, and upon execution and delivery by the Company of the Note, each of such instruments will constitute, a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms.

        c.        <u>Capitalization</u>.  As of the date hereof, the authorized common stock of the Company consists of 324,125,983 authorized shares of Common Stock, $0.0001 par value per share, of which 1,200,000,000 shares are issued and outstanding; and 9,090,909 shares are reserved for issuance upon conversion of the Note.  All of such outstanding shares of capital stock are, or upon issuance will be, duly authorized, validly issued, fully paid and non-assessable.  .

        d.        <u>Issuance of Shares</u>.  The Conversion Shares are duly authorized and reserved for issuance and, upon conversion of the Note in accordance with its terms, will be validly issued, fully paid and non-assessable, and free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Company and will not impose personal liability upon the holder thereof.

        e.        <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement and the Note by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance and reservation for issuance of the Conversion Shares) will not (i) conflict with or result in a violation of any provision of the Certificate of Incorporation or By-laws, or (ii) violate or conflict with, or result in a breach of any provision of, or constitute a default (or an event which with notice or lapse of time or both could become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture, patent, patent license or instrument to which the Company or any of its Subsidiaries is a party, or (iii)  result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and regulations of any self-regulatory organizations to which the Company or its securities are subject) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected (except for such conflicts, defaults, terminations, amendments, accelerations, cancellations and violations as would not, individually or in the aggregate, have a Material Adverse Effect).  The businesses of the Company and its Subsidiaries, if any, are not being conducted, and shall not be conducted so long as the Buyer owns any of the Securities, in violation of any law, ordinance or regulation of any governmental entity.  "Material Adverse Effect" means any material adverse effect on the business, operations, assets, financial condition or prospects of the Company or its Subsidiaries, if any, taken as a whole, or on the transactions contemplated hereby or by the agreements or instruments to be entered into in connection herewith.

        f.        <u>SEC Documents; Financial Statements</u>.  The Company has filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "1934 Act") (all of the

foregoing filed prior to the date hereof and all exhibits included therein and financial statements and schedules thereto and documents (other than exhibits to such documents) incorporated by reference therein, being hereinafter referred to herein as the "SEC Documents").  Upon written request the Company will deliver to the Buyer true and complete copies of the SEC Documents, except for such exhibits and incorporated documents.  As of their respective dates or if amended, as of the dates of the amendments, the SEC Documents complied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. None of the statements made in any such SEC Documents is, or has been, required to be amended or updated under applicable law (except for such statements as have been amended or updated in subsequent filings prior the date hereof).  As of their respective dates or if amended, as of the dates of the amendments, the financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto.  Such financial statements have been prepared in accordance with United States generally accepted accounting principles, consistently applied, during the periods involved and fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments).  The Company is subject to the reporting requirements of the 1934 Act.

g.  <u>Absence of Certain Changes</u>.  Since August 31, 2018, except as set forth in the SEC Documents, there has been no material adverse change and no material adverse development in the assets, liabilities, business, properties, operations, financial condition, results of operations, prospects or 1934 Act reporting status of the Company or any of its Subsidiaries.

h.  <u>Absence of Litigation</u>.  Except as set forth in the SEC Documents, there is no action, suit, claim, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body pending or, to the knowledge of the Company or any of its Subsidiaries, threatened against or affecting the Company or any of its Subsidiaries, or their officers or directors in their capacity as such, that could have a Material Adverse Effect.  The Company and its Subsidiaries are unaware of any facts or circumstances which might give rise to any of the foregoing.

i.  <u>No Integrated Offering</u>.  Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales in any security or solicited any offers to buy any security under circumstances that would require registration under the 1933 Act of the issuance of the Securities to the Buyer.  The issuance of the Securities to the Buyer will not be integrated with any other issuance of the Company's securities (past, current or future) for purposes of any shareholder approval provisions applicable to the Company or its securities.

j.      No Brokers.  The Company has taken no action which would give rise to any claim by any person for brokerage commissions, transaction fees or similar payments relating to this Agreement or the transactions contemplated hereby.

k.      No Investment Company.  The Company is not, and upon the issuance and sale of the Securities as contemplated by this Agreement will not be an "investment company" required to be registered under the Investment Company Act of 1940 (an "Investment Company").  The Company is not controlled by an Investment Company.

l.      Breach of Representations and Warranties by the Company.   If the Company breaches any of the representations or warranties set forth in this Section 3, and in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an Event of default under Section 3.4 of the Note.

4.      COVENANTS.

a.      Best Efforts.  The Company shall use its best efforts to satisfy timely each of the conditions described in Section 7 of this Agreement.

b.      Form D; Blue Sky Laws.  The Company agrees to timely make any filings required by federal and state laws as a result of the closing of the transactions contemplated by this Agreement.

c.      Use of Proceeds.   The Company shall use the proceeds for general working capital purposes.

d.      Expenses.  At the Closing, the Company's obligation with respect to the transactions contemplated by this Agreement is to reimburse Buyer' expenses shall be $3,000.00 for Buyer's legal fees and due diligence fee.

e.      Corporate Existence.  So long as the Buyer beneficially owns any Note, the Company shall maintain its corporate existence and shall not sell all or substantially all of the Company's assets, except with the prior written consent of the Buyer.

f.      Breach of Covenants.  If the Company breaches any of the covenants set forth in this Section 4, and in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an event of default under Section 3.4 of the Note.

g.      Failure to Comply with the 1934 Act.  So long as the Buyer beneficially owns the Note, the Company shall comply with the reporting requirements of the 1934 Act; and the Company shall continue to be subject to the reporting requirements of the 1934 Act.

6

h.      Trading Activities.  Neither the Buyer nor its affiliates has an open short position in the common stock of the Company and the Buyer agrees that it shall not, and that it will cause its affiliates not to, engage in any short sales of or hedging transactions with respect to the common stock of the Company.

i.      Right of First Refusal.  Unless it shall have first delivered to the Buyer, at least forty eight (48) hours prior to the closing of such Future Offering (as defined herein), written notice describing the proposed Future Offering ("ROFR Notice"), including the terms and conditions thereof, identity of the proposed purchaser and proposed definitive documentation to be entered into in connection therewith, and providing the Buyer an option during the forty eight (48) hour period following delivery of such notice to purchase the securities being offered in the Future Offering on the same terms as contemplated by such Future Offering (the limitations referred to in this sentence and the preceding sentence are collectively referred to as the "Right of First Refusal"), the Company will not conduct any equity (or debt with an equity component) financing in an amount less than $150,000 ("Future Offering(s)") during the period beginning on the Closing Date and ending nine (9) months following the Closing Date.  In the event the terms and conditions of a proposed Future Offering are amended in any respect after delivery of the notice to the Buyer concerning the proposed Future Offering, the Company shall deliver a new notice to the Buyer describing the amended terms and conditions of the proposed Future Offering and the Buyer thereafter shall have an option during the forty eight (48) hour period following delivery of such new notice to purchase the securities being offered on the same terms as contemplated by such proposed Future Offering, as amended.

5.      Transfer Agent Instructions.  The Company shall issue irrevocable instructions to its transfer agent to issue certificates, registered in the name of the Buyer or its nominee, for the Conversion Shares in such amounts as specified from time to time by the Buyer to the Company upon conversion of the Note in accordance with the terms thereof (the "Irrevocable Transfer Agent Instructions").  In the event that the Company proposes to replace its transfer agent, the Company shall provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to this Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount as such term is defined in the Note) signed by the successor transfer agent to Company and the Company.  Prior to registration of the Conversion Shares under the 1933 Act or the date on which the Conversion Shares may be sold pursuant to an exemption from registration, all such certificates shall bear the restrictive legend specified in Section 2(e) of this Agreement.  The Company warrants that: (i) no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5, will be given by the Company to its transfer agent and that the Securities shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the Note; (ii) it will not direct its transfer agent not to transfer or delay, impair, and/or hinder its transfer agent in transferring (or issuing)(electronically or in certificated form) any certificate for Conversion Shares to be issued to the Buyer upon conversion of or otherwise pursuant to the Note as and when required by the Note and this Agreement; and (iii) it will not fail to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer

instructions in respect thereof) on any certificate for any Conversion Shares issued to the Buyer upon conversion of or otherwise pursuant to the Note as and when required by the Note and/or this Agreement. If the Buyer provides the Company and the Company's transfer agent, at the cost of the Buyer, with an opinion of counsel in form, substance and scope customary for opinions in comparable transactions, to the effect that a public sale or transfer of such Securities may be made without registration under the 1933 Act, the Company shall permit the transfer, and, in the case of the Conversion Shares, promptly instruct its transfer agent to issue one or more certificates, free from restrictive legend, in such name and in such denominations as specified by the Buyer. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer, by vitiating the intent and purpose of the transactions contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5 may be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section, that the Buyer shall be entitled, in addition to all other available remedies, to an injunction restraining any breach and requiring immediate transfer, without the necessity of showing economic loss and without any bond or other security being required.

6.     **Conditions to the Company's Obligation to Sell**. The obligation of the Company hereunder to issue and sell the Note to the Buyer at the Closing is subject to the satisfaction, at or before the Closing Date of each of the following conditions thereto, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion:

a.     The Buyer shall have executed this Agreement and delivered the same to the Company.

b.     The Buyer shall have delivered the Purchase Price in accordance with Section 1(b) above.

c.     The representations and warranties of the Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and the Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Buyer at or prior to the Closing Date.

d.     No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

7.     **Conditions to The Buyer's Obligation to Purchase**. The obligation of the Buyer hereunder to purchase the Note at the Closing is subject to the satisfaction, at or before the Closing Date

of each of the following conditions, provided that these conditions are for the Buyer's sole benefit and may be waived by the Buyer at any time in its sole discretion:

a.     The Company shall have executed this Agreement and delivered the same to the Buyer.

b.     The Company shall have delivered to the Buyer the duly executed Note (in such denominations as the Buyer shall request) in accordance with Section 1(b) above.

c.     The Irrevocable Transfer Agent Instructions, in form and substance satisfactory to the Buyer, shall have been delivered to and acknowledged in writing by the Company's Transfer Agent.

d.     The representations and warranties of the Company shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at such time (except for representations and warranties that speak as of a specific date) and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date. The Buyer shall have received a certificate or certificates, executed by the chief executive officer of the Company, dated as of the Closing Date, to the foregoing effect and as to such other matters as may be reasonably requested by the Buyer including, but not limited to certificates with respect to the Board of Directors' resolutions relating to the transactions contemplated hereby.

e.     No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

f.     No event shall have occurred which could reasonably be expected to have a Material Adverse Effect on the Company including but not limited to a change in the 1934 Act reporting status of the Company or the failure of the Company to be timely in its 1934 Act reporting obligations.

g.     The Conversion Shares shall have been authorized for quotation on an exchange or electronic quotation system and trading in the Common Stock on such exchange or electronic quotation system shall not have been suspended by the SEC or an exchange or electronic quotation system.

h.     The Buyer shall have received an officer's certificate described in Section 3(d) above, dated as of the Closing Date.

8.      Governing Law; Miscellaneous.

a.      Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without regard to principles of conflicts of laws.  Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of New York or in the federal courts located in New York and the county of Nassau.  The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*.  The Company and Buyer waive trial by jury. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs.  In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.  Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement, the Note or any related document or agreement by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

b.      Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party.

c.      Headings.  The headings of this Agreement are for convenience of reference only and shall not form part of, or affect the interpretation of, this Agreement.

d.      Severability.  In the event that any provision of this Agreement is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any provision hereof which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

e.      Entire Agreement; Amendments.  This Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor the Buyer makes any representation, warranty, covenant or undertaking with respect to such matters.  No provision of this Agreement may be waived or amended other than by an instrument in writing signed by the majority in interest of the Buyer.

10

      f.    <u>Notices</u>. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be as set forth in the heading of this Agreement with a copy by fax only to (which copy shall not constitute notice) to Naidich Wurman LLP, 111 Great Neck Road, Suite 214, Great Neck, NY 11021, Attn: Allison Naidich, facsimile: 516-466-3555, e-mail: allison@nwlaw.com. Each party shall provide notice to the other party of any change in address.

      g.    <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns. Neither the Company nor the Buyer shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other. Notwithstanding the foregoing, the Buyer may assign its rights hereunder to any person that purchases Securities in a private transaction from the Buyer or to any of its "affiliates," as that term is defined under the 1934 Act, without the consent of the Company.

      h.    <u>Survival</u>. The representations and warranties of the Company and the agreements and covenants set forth in this Agreement shall survive the closing hereunder notwithstanding any due diligence investigation conducted by or on behalf of the Buyer. The Company agrees to indemnify and hold harmless the Buyer and all of its officers, directors, employees and agents for loss or damage arising as a result of or related to any breach or alleged breach by the Company of any of its representations, warranties and covenants set forth in this Agreement or any of its covenants and obligations under this Agreement, including advancement of expenses as they are incurred.

      i.    <u>Further Assurances</u>. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

      j.    <u>No Strict Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

k.    <u>Remedies</u>.   The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer by vitiating the intent and purpose of the transaction contemplated hereby.  Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Agreement will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Agreement, that the Buyer shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Agreement and to enforce specifically the terms and provisions hereof, without the necessity of showing economic loss and without any bond or other security being required.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned Buyer and the Company have caused this Agreement to be duly executed as of the date first above written.

**HEMP NATURALS, INC.**

By: _____
     Levi Jacobson
     Chief Executive Officer

**POWER UP LENDING GROUP LTD.**

By: _____
Name: Curt Kramer
Title:  Chief Executive Officer
111 Great Neck Road, Suite 216
Great Neck, NY  11021

AGGREGATE SUBSCRIPTION AMOUNT:

Aggregate Principal Amount of Note:                    $43,000.00

Aggregate Purchase Price:                              $43,000.00

13



## SECURITIES PURCHASE AGREEMENT

This **SECURITIES PURCHASE AGREEMENT** (the "Agreement"), dated as of March 14, 2019, by and between **HEMP NATURALS, INC.,** a Delaware corporation, with its address at 16950 North Bay Road, Suite 1803, Sunny Isles Beach, Florida 33160 (the "Company"), and **POWER UP LENDING GROUP LTD.,** a Virginia corporation, with its address at 111 Great Neck Road, Suite 216, Great Neck, NY 11021 (the "Buyer").

### WHEREAS:

A.      The Company and the Buyer are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by the rules and regulations as promulgated by the United States Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "1933 Act"); and

B.      Buyer desires to purchase and the Company desires to issue and sell, upon the terms and conditions set forth in this Agreement a convertible note of the Company, in the form attached hereto as Exhibit A, in the aggregate principal amount of $68,000.00 (together with any note(s) issued in replacement thereof or as a dividend thereon or otherwise with respect thereto in accordance with the terms thereof, the "Note"), convertible into shares of common stock, $0.0001 par value per share, of the Company (the "Common Stock"), upon the terms and subject to the limitations and conditions set forth in such Note.

**NOW THEREFORE**, the Company and the Buyer severally (and not jointly) hereby agree as follows:

1.      <u>Purchase and Sale of Note.</u>

a.      <u>Purchase of Note</u>. On the Closing Date (as defined below), the Company shall issue and sell to the Buyer and the Buyer agrees to purchase from the Company such principal amount of Note as is set forth immediately below the Buyer's name on the signature pages hereto.

b.      <u>Form of Payment</u>. On the Closing Date (as defined below), (i) the Buyer shall pay the purchase price for the Note to be issued and sold to it at the Closing (as defined below) (the "Purchase Price") by wire transfer of immediately available funds to the Company, in accordance with the Company's written wiring instructions, against delivery of the Note in the principal amount equal to the Purchase Price as is set forth immediately below the Buyer's name on the signature pages hereto, and (ii) the Company shall deliver such duly executed Note on behalf of the Company, to the Buyer, against delivery of such Purchase Price.

c.      <u>Closing Date</u>. Subject to the satisfaction (or written waiver) of the conditions thereto set forth in Section 6 and Section 7 below, the date and time of the issuance and sale of the Note pursuant to this Agreement (the "Closing Date") shall be 12:00 noon, Eastern Standard Time on or about March 18, 2019, or such other mutually agreed upon time. The closing of the transactions

contemplated by this Agreement (the "Closing") shall occur on the Closing Date at such location as may be agreed to by the parties.

        2.    <u>Buyer's Representations and Warranties.</u>  The Buyer represents and warrants to the Company that:

        a.    <u>Investment Purpose</u>.  As of the date hereof, the Buyer is purchasing the Note and the shares of Common Stock issuable upon conversion of or otherwise pursuant to the Note (such shares of Common Stock being collectively referred to herein as the "Conversion Shares" and, collectively with the Note, the "Securities") for its own account and not with a present view towards the public sale or distribution thereof, except pursuant to sales registered or exempted from registration under the 1933 Act.

        b.    <u>Accredited Investor Status</u>.  The Buyer is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D (an "Accredited Investor").

        c.    <u>Reliance on Exemptions</u>.  The Buyer understands that the Securities are being offered and sold to it in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying upon the truth and accuracy of, and the Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of the Buyer to acquire the Securities.

        d.    <u>Information</u>.  The Company has not disclosed to the Buyer any material nonpublic information and will not disclose such information unless such information is disclosed to the public prior to or promptly following such disclosure to the Buyer.

        e.    <u>Legends</u>.  The Buyer understands that the Note and, until such time as the Conversion Shares have been registered under the 1933 Act; or may be sold pursuant to an applicable exemption from registration, the Conversion Shares may bear a restrictive legend in substantially the following form:

> "THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE PLEDGED, SOLD, ASSIGNED, HYPOTHECATED OR OTHERWISE TRANSFERRED UNLESS (1) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR (2) THE ISSUER OF SUCH SECURITIES RECEIVES AN OPINION OF COUNSEL TO THE HOLDER OF SUCH SECURITIES, WHICH COUNSEL AND OPINION ARE REASONABLY ACCEPTABLE TO THE ISSUER'S TRANSFER AGENT, THAT SUCH SECURITIES MAY BE PLEDGED, SOLD, ASSIGNED, HYPOTHECATED OR OTHERWISE

TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT
UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS."

The legend set forth above shall be removed and the Company shall issue a certificate without such legend to the holder of any Security upon which it is stamped, if, unless otherwise required by applicable state securities laws, (a) such Security is registered for sale under an effective registration statement filed under the 1933 Act or otherwise may be sold pursuant to an exemption from registration without any restriction as to the number of securities as of a particular date that can then be immediately sold, or (b) such holder provides the Company with an opinion of counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that a public sale or transfer of such Security may be made without registration under the 1933 Act, which opinion shall be accepted by the Company so that the sale or transfer is effected.  The Buyer agrees to sell all Securities, including those represented by a certificate(s) from which the legend has been removed, in compliance with applicable prospectus delivery requirements, if any. In the event that the Company does not accept the opinion of counsel provided by the Buyer with respect to the transfer of Securities pursuant to an exemption from registration, such as Rule 144, at the Deadline, it will be considered an Event of Default pursuant to Section 3.2 of the Note.

f.      Authorization; Enforcement. This Agreement has been duly and validly authorized.  This Agreement has been duly executed and delivered on behalf of the Buyer, and this Agreement constitutes a valid and binding agreement of the Buyer enforceable in accordance with its terms.

3.      Representations and Warranties of the Company. The Company represents and warrants to the Buyer that:

a.      Organization and Qualification. The Company and each of its Subsidiaries (as defined below), if any, is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, with full power and authority (corporate and other) to own, lease, use and operate its properties and to carry on its business as and where now owned, leased, used, operated and conducted.  "Subsidiaries" means any corporation or other organization, whether incorporated or unincorporated, in which the Company owns, directly or indirectly, any equity or other ownership interest.

b.      Authorization; Enforcement. (i) The Company has all requisite corporate power and authority to enter into and perform this Agreement, the Note and to consummate the transactions contemplated hereby and thereby and to issue the Securities, in accordance with the terms hereof and thereof, (ii) the execution and delivery of this Agreement, the Note by the Company and the consummation by it of the transactions contemplated hereby and thereby (including without limitation, the issuance of the Note and the issuance and reservation for issuance of the Conversion Shares issuable upon conversion or exercise thereof) have been duly authorized by the Company's Board of Directors and no further consent or authorization of the Company, its Board of Directors, or its shareholders is required,

(iii) this Agreement has been duly executed and delivered by the Company by its authorized representative, and such authorized representative is the true and official representative with authority to sign this Agreement and the other documents executed in connection herewith and bind the Company accordingly, and (iv) this Agreement constitutes, and upon execution and delivery by the Company of the Note, each of such instruments will constitute, a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms.

        c.     <u>Capitalization</u>.  As of the date hereof, the authorized common stock of the Company consists of 324,125,983 authorized shares of Common Stock, $0.0001 par value per share, of which 1,200,000,000 shares are issued and outstanding; and 2,979,189 shares are reserved for issuance upon conversion of the Note.  All of such outstanding shares of capital stock are, or upon issuance will be, duly authorized, validly issued, fully paid and non-assessable.  .

        d.     <u>Issuance of Shares</u>.  The Conversion Shares are duly authorized and reserved for issuance and, upon conversion of the Note in accordance with its respective terms, will be validly issued, fully paid and non-assessable, and free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Company and will not impose personal liability upon the holder thereof.

        e.     <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement, the Note by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance and reservation for issuance of the Conversion Shares) will not (i) conflict with or result in a violation of any provision of the Certificate of Incorporation or By-laws, or (ii) violate or conflict with, or result in a breach of any provision of, or constitute a default (or an event which with notice or lapse of time or both could become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture, patent, patent license or instrument to which the Company or any of its Subsidiaries is a party, or (iii)  result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and regulations of any self-regulatory organizations to which the Company or its securities are subject) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected (except for such conflicts, defaults, terminations, amendments, accelerations, cancellations and violations as would not, individually or in the aggregate, have a Material Adverse Effect).  The businesses of the Company and its Subsidiaries, if any, are not being conducted, and shall not be conducted so long as the Buyer owns any of the Securities, in violation of any law, ordinance or regulation of any governmental entity.  "Material Adverse Effect" means any material adverse effect on the business, operations, assets, financial condition or prospects of the Company or its Subsidiaries, if any, taken as a whole, or on the transactions contemplated hereby or by the agreements or instruments to be entered into in connection herewith.

        f.     <u>SEC Documents; Financial Statements</u>.  The Company has filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "1934 Act") (all of the foregoing filed prior to the date hereof and all exhibits included therein and financial statements and

schedules thereto and documents (other than exhibits to such documents) incorporated by reference therein, being hereinafter referred to herein as the "SEC Documents"). Upon written request the Company will deliver to the Buyer true and complete copies of the SEC Documents, except for such exhibits and incorporated documents. As of their respective dates or if amended, as of the dates of the amendments, the SEC Documents complied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. None of the statements made in any such SEC Documents is, or has been, required to be amended or updated under applicable law (except for such statements as have been amended or updated in subsequent filings prior the date hereof). As of their respective dates or if amended, as of the dates of the amendments, the financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto. Such financial statements have been prepared in accordance with United States generally accepted accounting principles, consistently applied, during the periods involved and fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). The Company is subject to the reporting requirements of the 1934 Act.

g. <u>Absence of Certain Changes</u>. Since August 31, 2018, except as set forth in the SEC Documents, there has been no material adverse change and no material adverse development in the assets, liabilities, business, properties, operations, financial condition, results of operations, prospects or 1934 Act reporting status of the Company or any of its Subsidiaries.

h. <u>Absence of Litigation</u>. Except as set forth in the SEC Documents, there is no action, suit, claim, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body pending or, to the knowledge of the Company or any of its Subsidiaries, threatened against or affecting the Company or any of its Subsidiaries, or their officers or directors in their capacity as such, that could have a Material Adverse Effect. The Company and its Subsidiaries are unaware of any facts or circumstances which might give rise to any of the foregoing.

i. <u>No Integrated Offering</u>. Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales in any security or solicited any offers to buy any security under circumstances that would require registration under the 1933 Act of the issuance of the Securities to the Buyer. The issuance of the Securities to the Buyer will not be integrated with any other issuance of the Company's securities (past, current or future) for purposes of any shareholder approval provisions applicable to the Company or its securities.

j. <u>No Brokers</u>.  The Company has taken no action which would give rise to any claim by any person for brokerage commissions, transaction fees or similar payments relating to this Agreement or the transactions contemplated hereby.

k. <u>No Investment Company</u>.  The Company is not, and upon the issuance and sale of the Securities as contemplated by this Agreement will not be an "investment company" required to be registered under the Investment Company Act of 1940 (an "Investment Company").  The Company is not controlled by an Investment Company.

l. <u>Breach of Representations and Warranties by the Company</u>.  If the Company breaches any of the representations or warranties set forth in this Section 3, and in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an Event of default under Section 3.4 of the Note.

4. <u>COVENANTS</u>.

a. <u>Best Efforts</u>.  The Company shall use its best efforts to satisfy timely each of the conditions described in Section 7 of this Agreement.

b. <u>Form D; Blue Sky Laws</u>.  The Company agrees to timely make any filings required by federal and state laws as a result of the closing of the transactions contemplated by this Agreement.

c. <u>Use of Proceeds</u>.  The Company shall use the proceeds for general working capital purposes.

d. <u>Expenses</u>.  At the Closing, the Company's obligation with respect to the transactions contemplated by this Agreement is to reimburse Buyer' expenses shall be $3,000.00 for Buyer's legal fees and due diligence fee.

e. <u>Corporate Existence</u>.  So long as the Buyer beneficially owns any Note, the Company shall maintain its corporate existence and shall not sell all or substantially all of the Company's assets, except with the prior written consent of the Buyer.

f. <u>Breach of Covenants</u>.  If the Company breaches any of the covenants set forth in this Section 4, and in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an event of default under Section 3.4 of the Note.

g. <u>Failure to Comply with the 1934 Act</u>.  So long as the Buyer beneficially owns the Note, the Company shall comply with the reporting requirements of the 1934 Act; and the Company shall continue to be subject to the reporting requirements of the 1934 Act.

h.    <u>Trading Activities</u>.  Neither the Buyer nor its affiliates has an open short position in the common stock of the Company and the Buyer agrees that it shall not, and that it will cause its affiliates not to, engage in any short sales of or hedging transactions with respect to the common stock of the Company.

5.    <u>Transfer Agent Instructions</u>.  The Company shall issue irrevocable instructions to its transfer agent to issue certificates, registered in the name of the Buyer or its nominee, for the Conversion Shares in such amounts as specified from time to time by the Buyer to the Company upon conversion of the Note in accordance with the terms thereof (the "Irrevocable Transfer Agent Instructions"). In the event that the Company proposes to replace its transfer agent, the Company shall provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to this Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount as such term is defined in the Note) signed by the successor transfer agent to Company and the Company. Prior to registration of the Conversion Shares under the 1933 Act or the date on which the Conversion Shares may be sold pursuant to an exemption from registration, all such certificates shall bear the restrictive legend specified in Section 2(e) of this Agreement.  The Company warrants that: (i) no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5, will be given by the Company to its transfer agent and that the Securities shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the Note; (ii) it will not direct its transfer agent not to transfer or delay, impair, and/or hinder its transfer agent in transferring (or issuing)(electronically or in certificated form) any certificate for Conversion Shares to be issued to the Buyer upon conversion of or otherwise pursuant to the Note as and when required by the Note and this Agreement; and (iii) it will not fail to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Buyer upon conversion of or otherwise pursuant to the Note as and when required by the Note and/or this Agreement.  If the Buyer provides the Company and the Company's transfer, at the cost of the Buyer, with an opinion of counsel in form, substance and scope customary for opinions in comparable transactions, to the effect that a public sale or transfer of such Securities may be made without registration under the 1933 Act, the Company shall permit the transfer, and, in the case of the Conversion Shares, promptly instruct its transfer agent to issue one or more certificates, free from restrictive legend, in such name and in such denominations as specified by the Buyer.  The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer, by vitiating the intent and purpose of the transactions contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5 may be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section, that the Buyer shall be entitled, in addition to all other available remedies, to an injunction restraining any breach and requiring immediate transfer, without the necessity of showing economic loss and without any bond or other security being required.

6.      <u>Conditions to the Company's Obligation to Sell</u>.  The obligation of the Company hereunder to issue and sell the Note to the Buyer at the Closing is subject to the satisfaction, at or before the Closing Date of each of the following conditions thereto, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion:

a.      The Buyer shall have executed this Agreement and delivered the same to the Company.

b.      The Buyer shall have delivered the Purchase Price in accordance with Section 1(b) above.

c.      The representations and warranties of the Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and the Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Buyer at or prior to the Closing Date.

d.      No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

7.      <u>Conditions to The Buyer's Obligation to Purchase</u>.  The obligation of the Buyer hereunder to purchase the Note at the Closing is subject to the satisfaction, at or before the Closing Date of each of the following conditions, provided that these conditions are for the Buyer's sole benefit and may be waived by the Buyer at any time in its sole discretion:

a.      The Company shall have executed this Agreement and delivered the same to the Buyer.

b.      The Company shall have delivered to the Buyer the duly executed Note (in such denominations as the Buyer shall request) in accordance with Section 1(b) above.

c.      The Irrevocable Transfer Agent Instructions, in form and substance satisfactory to the Buyer, shall have been delivered to and acknowledged in writing by the Company's Transfer Agent.

d.      The representations and warranties of the Company shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at such time (except for representations and warranties that speak as of a specific date) and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and

conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date. The Buyer shall have received a certificate or certificates, executed by the chief executive officer of the Company, dated as of the Closing Date, to the foregoing effect and as to such other matters as may be reasonably requested by the Buyer including, but not limited to certificates with respect to the Board of Directors' resolutions relating to the transactions contemplated hereby.

e. No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

f. No event shall have occurred which could reasonably be expected to have a Material Adverse Effect on the Company including but not limited to a change in the 1934 Act reporting status of the Company or the failure of the Company to be timely in its 1934 Act reporting obligations.

g. The Conversion Shares shall have been authorized for quotation on an exchange or electronic quotation system and trading in the Common Stock on such exchange or electronic quotation system shall not have been suspended by the SEC or an exchange or electronic quotation system.

8. Governing Law; Miscellaneous.

a. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Virginia without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of New York or in the federal courts located in the Eastern District of New York. The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. The Company and Buyer waive trial by jury. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement, the Note or any related document or agreement by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained

9

herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

      b.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party.

      c.    <u>Headings</u>.  The headings of this Agreement are for convenience of reference only and shall not form part of, or affect the interpretation of, this Agreement.

      d.    <u>Severability</u>.  In the event that any provision of this Agreement is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any provision hereof which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

      e.    <u>Entire Agreement; Amendments</u>.  This Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor the Buyer makes any representation, warranty, covenant or undertaking with respect to such matters.  No provision of this Agreement may be waived or amended other than by an instrument in writing signed by the majority in interest of the Buyer.

      f.    <u>Notices</u>.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be as set forth in the heading of this Agreement with a copy by fax only to (which copy shall not constitute notice) to Naidich Wurman LLP, 111 Great Neck Road, Suite 214, Great Neck, NY 11021, Attn: Allison Naidich, facsimile: 516-466-3555, e-mail: allison@nwlaw.com.  Each party shall provide notice to the other party of any change in address.

g.     <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns.  Neither the Company nor the Buyer shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other.  Notwithstanding the foregoing, the Buyer may assign its rights hereunder to any person that purchases Securities in a private transaction from the Buyer or to any of its "affiliates," as that term is defined under the 1934 Act, without the consent of the Company.

h.     <u>Survival</u>.  The representations and warranties of the Company and the agreements and covenants set forth in this Agreement shall survive the closing hereunder notwithstanding any due diligence investigation conducted by or on behalf of the Buyer.  The Company agrees to indemnify and hold harmless the Buyer and all their officers, directors, employees and agents for loss or damage arising as a result of or related to any breach or alleged breach by the Company of any of its representations, warranties and covenants set forth in this Agreement or any of its covenants and obligations under this Agreement, including advancement of expenses as they are incurred.

i.     <u>Further Assurances</u>.  Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

j.     <u>No Strict Construction</u>.  The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

k.     <u>Remedies</u>.  The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer by vitiating the intent and purpose of the transaction contemplated hereby.  Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Agreement will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Agreement, that the Buyer shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Agreement and to enforce specifically the terms and provisions hereof, without the necessity of showing economic loss and without any bond or other security being required.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

11

IN WITNESS WHEREOF, the undersigned Buyer and the Company have caused this Agreement to be duly executed as of the date first above written.

**HEMP NATURALS, INC.**

By:_____

      Levi Jacobson
      Chief Executive Officer

**POWER UP LENDING GROUP LTD.**

By: _____
Name: Curt Kramer
Title:   Chief Executive Officer
111 Great Neck Road, Suite 216
Great Neck, NY  11021

AGGREGATE SUBSCRIPTION AMOUNT:

Aggregate Principal Amount of Note:               $68,000.00

Aggregate Purchase Price:                      $68,000.00

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
---------------------------------------------------------------

POWER UP LENDING GROUP, LTD.,

Case Number 607759/2019

      Plaintiff,

 -against-

HEMP NATURALS, INC., LEVI JACOBSON,
AND YOSEF BLEIER,

      Defendants.
---------------------------------------------------------------

**NOTICE OF REMOVAL OF
MATTER TO THE UNITED
STATES DISTRICT COURT
FOR THE EASTERN DISTRICT
OF NEW YORK**

   **PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. §§1331, 1332, 1441, and

1446, Defendants Hemp Naturals, Inc. ("Naturals"), Levi Jacobson ("Jacobson"), and Yosef

Bleier ("Bleier") have removed the above-captioned matter to the United States District Court

for the Eastern District of New York.  Copies of the Notice of Removal, the Exhibits attached

thereto, and the Civil Cover Sheet are attached hereto.

Dated: New York, New York
   July 8, 2019

        **The Law Offices of Scott L. Fenstermaker, P.C.**


By:  _____
    Scott L. Fenstermaker, Esq.
    Attorney for Defendants
    100 Park Avenue, 16th Floor
    New York, New York 10017
    917-817-9001
    scott@fenstermakerlaw.com


To: Clerk of the Court     Naidich Wurman, LLP
  New York State Supreme Court  Attorneys for Plaintiff
  Nassau County      111 Great Neck Road, Suite 214
  100 Supreme Court Drive   Great Neck, New York 11021
  Mineola, New York 11501